**Elnora PHILLIPS, Special Administrator of the Estate of Jerry Dean Phillips, Deceased, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 85–1291.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 6, 1985.

Decided June 5, 1986.

Gordon Lambert Harris, Lambert & Wilson, Marion, Ill., for plaintiff-appellant.

Robert L. Simpkins, Asst. U.S. Atty. (Frederick J. Hess, U.S. Atty.), East St. Louis, Ill., for defendant-appellee.

Before FLAUM and EASTERBROOK, Circuit Judges, and WILL, Senior District Judge.*

WILL, Senior District Judge.

This is an action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). It arises out of the accidental death of Jerry Dean Phillips ("Phillips"), the husband of Elnora Phillips, who sues as the Administrator of his estate ("Administrator"). The accident on Monday, April 20, 1981, occurred when Phillips, an independent electrical sub-contractor who was installing conduit and lights on a water tower on the grounds of the United States Veterans Administration Hospital ("VA" or "Hospital") in Marion, Illinois, slipped and fell to his death from over half way up the 160 foot tower.

The case was tried by agreement before United States Magistrate Kenneth Meyers of the Southern District of Illinois who found for the defendant on all three counts of the complaint. For the reasons set forth herein, we affirm, though not without some regret, since this episode was truly a tragedy of errors.

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

## I. *The Applicable Statutes*

A. The Federal Tort Claims Act provides in relevant part, 28 U.S.C. § 1346(b):

(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

B. Section 1 of the Illinois Structural Work Act, Ill.Rev.Stat. ch. 48, § 60, provides in relevant part:

All scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, ...

C. Section 5 of the Illinois Structural Work Act, Ill.Rev.Stat. ch. 48, § 64, provides in relevant part:

Any person, firm or corporation in this State, hiring, employing or directing another to perform labor of any kind, in the erecting, repairing, altering or painting of any water pipe, stand pipe, tank,

smoke stack, chimney, tower, steeple, pole, staff, dome or cupola, when the use of any scaffold, staging, swing, hammock, support, temporary platform or other similar contrivance are required or used, in the performance of such labor, shall keep and maintain at all times, while such labor is being performed, and such mechanical device is in use or operation, a safe and proper scaffold, stay, support or other suitable device, not less than sixteen (16) feet or more below such working scaffold, staging, swing, hammock, support or temporary platform, when such work is being performed, at a height of thirty-two (32) feet, for the purpose of preventing the person or persons performing such labor, from falling in case of any accident to such working scaffold, staging, swing, hammock, support or temporary platform.

D. Section 9 of the Illinois Structural Work Act, Ill.Rev.Stat. ch. 48, § 69, provides in relevant part:

§ 9. Any owner, contractor, sub-contractor, foreman or other person having charge of the ... repairing, [or] alteration, ... of any ... structure within the provisions of this act, shall comply with all the terms thereof....

\* \* \* \* \* \*

For any injury to person or property, occasioned by any wilful violations of this Act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby; and in case of loss of life by reason of such wilful violation or wilful failure as aforesaid, a right of action shall accrue to the surviving spouse of the person so killed, ... for a like recovery of damages for the injuries sustained by reason of such loss of life or lives.

## II. *The Issue*

Was the magistrate's finding for the defendant as to any of the following issues clearly erroneous?

A. Was the VA "in charge" of the work being done by Phillips at the time of his death as contemplated by section 9 of the Illinois Structural Work Act?

B. Did the VA wilfully violate the Illinois Structural Work Act or wilfully fail to comply with its provisions?

C. Was Phillips a person who, at the time of his death, was hired, employed or directed by the VA as contemplated by section 5 of the Illinois Structural Work Act?

D. Was the VA guilty of negligence which proximately caused Phillips' death?

## III. *The Facts*

The Hospital in Marion, Illinois, has a water tower on the premises in an enclosed area with a locked gate. There are five Quonset huts to the north-northeast of the tower and just north of them is a building, some 200–300 feet from the tower, housing the Engineering Services Office in which Chief Engineers Robert Mathews and Robert Porter, Assistant Chief Engineer James Holland ("Holland") and engineering technician Anthony Lynch ("Lynch") all had offices.

In 1980, the VA constructed a helicopter landing pad at the Hospital near the water tower and in early 1981 decided that new warning lights should be placed on top of the tower. Lynch was assigned to draw up plans and specifications for the job and monitor its performance. Lynch prepared plans as well as a one-page specification which provided:

Contractor shall furnish all equipment, tools, materials, labor, and other various items as required to remove existing obstruction lights (2 each) and install new ¾ inch rigid conduit (approximately 200 L.F.) from existing control box up to the point where old obstruction lights are to be removed. The conduit shall run parallel to existing 1 inch conduit, through the catwalk, to the peak of water tower canopy. The completed installation shall include two # 10 TW conductors to feed newly installed obstruction lights, two lamp fixtures, two FAA approved globes, two 100 watt extended life lamps. The conduit shall be attached

with proper clamps and fittings as required for stable, rigid installation. All electrical work shall be installed to comply with all laws applying to the electrical installations, shall conform with the regulations of the N.E.C. and V.A. Construction and Installation Standards and Specifications. All materials shall conform to the standards of the Underwriters Laboratories, Inc.

An Invitation to Bid was prepared and copies were sent to a number of contractors including Linda Flood d/b/a Flood Construction Company ("Flood"). Since the project was designated as a "small business set aside," the prime contract had to be awarded to a minority-owned small business. Jerry Phillips d/b/a P. & W. Electric Company ("P & W") also learned about the project and approached Lynch about bidding on the job. P & W had done some electrical work for the Hospital as a subcontractor on two previous occasions.

Both companies were relatively new businesses. Flood had recently been started by Linda Flood, a full-time Secretary at Southern Illinois University in Carbondale, and her brother, Charles King ("King"), who had some general construction experience, and qualified as a minority-owned business, because it was presumably female-owned although King also apparently had some interest in it. P & W had been formed by Phillips, who worked as a fulltime employee of the Illinois Central Gulf Railroad and operated the electrical business from his garage on a part-time basis. P & W did not qualify as a minority-owned business.

Both companies submitted bids, Flood for $2,400 and P & W for either $1,200, $1,250 or $1,500; the record, surprisingly, is not clear. After the contract was awarded to Flood, Lynch told Linda Flood that Phillips had done some electrical work for the Hospital in the past and could possibly do the actual work as a subcontractor since Flood apparently had no one experienced in the kind of work involved. Lynch also told Phillips that, since P & W did not qualify as a minority-owned small business, it could not obtain the contract. He suggest-

ed that, although the contract had been awarded to Flood, P & W might still do the work as a subcontractor.

Neither Linda Flood nor Phillips was aware of the other's bid or of their companies' existences prior to this time. As a result of Lynch's suggestions, Flood and P & W negotiated a subcontract under which P & W was to perform the electrical work on the water tower for $1,500. Flood's contract with the VA provided, in substance:

(A) the VA could make any change it desired in the work, within the general scope of the contract, by written order. The contract specifically provided the following four changes that could be made, although the contract also provided that the changes which could be made were not limited to these four:

(1) changes in the specifications (including drawings and design);

(2) changes in the method or manner of performance of the work;

(3) changes in the government-furnished facilities, equipment, materials, services, or site;

(4) changes by directing acceleration in the performance of the work;

(B) the VA had access, at all times, to a copy of the drawings and specifications from the contractor;

(C) the VA could require the contractor to furnish to the VA for approval, full information concerning the materials or articles which he contemplated incorporating in the work;

(D) the VA could, in writing, require the contractor to remove from the work any employee the VA deemed incompetent, careless, or otherwise objectionable;

(E) the VA had the right to inspect and test, at reasonable times, all work (including materials and workmanship) prior to acceptance;

(F) the VA had the right to approve or reject the superintendent that the contractor kept on the job;

(G) the VA could order the contractor, in writing, to suspend, delay, or interrupt all or any part of the work for such

period of time as the VA might determine to be appropriate for its convenience.

After the agreements were concluded but before any actual work began, Lynch met with King and Keith Wolinski ("Wolinski"), apparently the "W" of "P & W" and who was working with Phillips on the tower when he fell. They discussed the plans and specifications and the materials to be used as well as the requirement that the prime contractor be on the job at any time work was being performed to supervise the performance of the subcontractor. In addition, they discussed the requirement that the general contractor had to notify Lynch any time the subcontractor was going to work. P & W was accordingly obligated to notify Flood so that King, who was to be the supervisor, could be present and notify Lynch.

At the meeting, Lynch made it clear that he was to be notified either by Flood or P & W or both when work was to be done, and how it was to be done though his dealings were to be principally with the prime contractor. He also advised them that samples of materials to be used should be furnished to him in advance for approval as to quality and compliance with the contract.

The customary practice at the VA was for the prime contractor to be instructed to inform the Engineering Services Office when and what work was going to be performed. This could be done either in person or by phone. The reason for such notification was so that inspections could be made of the work as it progressed and, if approved, partial and final payments authorized.

Apparently without notifying either Flood or the Engineering Services Office that he intended to work on Saturday, April 18, a day when the office was closed, Phillips, Wolinski and a high school student Mark Evans ("Evans") began work on the tower in the afternoon of the 18th. The record contains a receipt (Def.Ex. 3) dated 4/17/81 signed by Evans for a G.A.–1 key which was apparently used to unlock the gate on the enclosure surrounding the tower. Neither Evans nor any VA employee recalled Evans getting the key. The record is unfortunately almost bare on this important fact. Wolinski's recollection was that he or Phillips got the key on the 17th. No one, however, had any recollection of when, from whom, or what was said at the time the key was obtained.

Their method of operation was for Phillips and Wolinski to climb the ladder which was located on the leg of the tower adjacent to the one on which the conduit was to be strapped and walk across a horizontal tower support to the conduit leg. Evans remained on the ground with the conduit, tools, etc. which Phillips had brought in his van. Evans' job was to attach sections of conduit to a rope pulley and raise them up to the level at which Phillips and Wolinski were working.

Each man on the tower wore a lineman's safety belt provided by Phillips to which was attached a leather safety strap fastened at each hip position on the belt and wrapped either around the tower's crossed safety cables as he walked from the ladder leg to the one to which the conduit was being attached or around the tower leg on which he was climbing or working. No lifeline or safety net was used to limit the possible fall distance. Phillips made the decision to use only the safety belt and leather strap.

The men worked some four hours on Saturday afternoon, April 18, at the end of which they had strung approximately 80 feet of conduit up the tower from the ground. When they finished, they locked the gate and kept the key.

On Monday, Phillips talked to Linda Flood, told her, to her surprise, that the work was already started and would be completed in a couple of days. He also told her that he would let her know exactly the day he and his crew would resume work. That afternoon at about 2:00 p.m., again apparently without notifying anyone, and at a time when Lynch was not on the premises, Phillips, Wolinski and Evans resumed working on the tower. Shortly be-

fore 4:00 p.m., Wolinski and Phillips reached the catwalk at the base of the tank 120 feet above the ground. Wolinski was on the catwalk and Phillips was on the conduit tower leg just below it.

At about the same time, Holland met Lynch in the Engineering Services Office and Lynch said, "The goddamn contractor is out there and almost half finished, and I didn't know he was even out there; how am I suppose [sic] to keep track of the job if he is going to do that?" While Holland and Lynch were talking, Phillips apparently lost his footing on the cross-hatch braces of the tower leg Wolinski and he had used like rungs on a ladder to move up and stand on while they worked. He slid some thirty feet down the conduit tower leg with the leather strap wrapped around the leg and fastened to his safety belt keeping him close to it. Just before the next level of horizontal tower supports, the leather strap hit the base of the tower diagonal safety cable attached at that point and severed. Phillips jolted momentarily, then fell away from the leg down some 90 feet to his death. The next thing Holland and Lynch were aware of was someone shouting "He's dead."

### IV. *Analysis and Decision*

We note, first, as the Magistrate found, that an administrative claim was properly filed under the Federal Tort Claims Act which was denied by the Veterans Administration on January 9, 1984. As a result, the plaintiff has exhausted her administrative remedies and the district court had jurisdiction under 28 U.S.C. § 1346(b).

It is also clear, although the appellant disagrees, that the Magistrate's findings of fact on the claims brought pursuant to the Federal Tort Claims Act, the Illinois Structural Work Act as well as common law negligence, must be affirmed unless clearly erroneous. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The appellant contends that ultimate facts, like conclusions of law, are subject to independent examination upon review and are not subject to the "clearly erroneous" rule, *citing United*

*States v. City of Chicago*, 549 F.2d 415, 425 (7th Cir.1977) (independent review of "ultimate fact of discrimination") and *Dunlop v. City Electric, Inc.*, 527 F.2d 394, 396 (5th Cir.1976) (findings of fact induced by erroneous view of the law). This contention was rejected by the Supreme Court in 1982. *Pullman-Standard v. Swint*, 456 U.S. 273, 285–90, 102 S.Ct. 1781, 1788–91, 72 L.Ed.2d 66 (1982). "Ultimate facts" are facts just like any other, and may be overturned on appeal only if clearly erroneous. *Id.* The holding in the first case relied upon by appellant is no longer good law under the holding in *Pullman-Standard*, 456 U.S. at 289–90, 102 S.Ct. at 1790–91, *accord Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423 (7th Cir.1985), *cert. denied*, ___ U.S. ___, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986); the second is not pertinent.

Rule 52(a) of the Federal Rules of Civil Procedure provides that the district court's findings of fact (including those of a magistrate hearing a civil case by consent of the parties under 28 U.S.C. § 636) can only be overturned if the decision is "clearly erroneous." The United States Supreme Court has held that "[a] finding [of fact] is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 394–95, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948). *See also Anderson*, 105 S.Ct. 1504 (1985). Applying that definition, we proceed to review the Magistrate's findings here.

As to count I of the complaint under the Illinois Structural Work Act ("Act"), the Magistrate found that the VA did not "have charge of" Phillips' repairing of the tower. The Magistrate did find that the tower was a structure, that Phillips was standing on a scaffold or ladder at the time of the accident, and that he was engaged at the time in the erection, repair, alteration or removal of a structure, all as required by section 1 of the Act.

Under ordinary circumstances, a property owner with the authority the VA reserved in its contract might be deemed, under section 9 of the Act, to have charge of the work. The Illinois Courts have given the phrase "having charge of" a broad interpretation and have indicated that supervision and control and the retention of the right to supervise and control are relevant, but are not either necessary or conclusive factors. *See Emberton v. State Farm Mutual Auto Insurance Co.,* 71 Ill.2d 111, 117, 15 Ill.Dec. 664, 666, 373 N.E.2d 1348, 1350 (1978); *Larson v. Commonwealth Edison Co.,* 33 Ill.2d 316, 322, 211 N.E.2d 247, 251 (1965).

Where, as here, the employee of an independent contractor (or his surviving spouse) seeks to recover from the owner of the property he was injured upon, the owner has been found to "have charge of" the work only where the owner has "some direct connection with the operations, over and above mere ownership or the employment of an independent contractor." *See, e.g., Emberton,* 71 Ill.2d at 123, 15 Ill.Dec. at 669, 373 N.E.2d at 1353; *Larson,* 33 Ill.2d at 322, 211 N.E.2d at 251. A "direct connection to the work" may be proved by evidence of inspections or other activities and may also stem from the right to control the work whether or not that right is exercised." *Emberton* 71 Ill.2d at 119, 15 Ill.Dec at 668, 373 N.E.2d at 1351.

Whether one has charge of the work is a question of fact, a finding which can be overturned on review only if it is clearly erroneous. *See Simmons v. Union Electric Co.,* 104 Ill.2d 444, 452, 85 Ill.Dec. 347, 350, 473 N.E.2d 946, 949 (1984). "The factual inquiry involves numerous factors, including those enunciated in *Chance v. City of Collinsville,* 112 Ill.App.3d 6, 11, 67 Ill.Dec. 747, 752, 445 N.E.2d 39, 42 (1983)." *Id.* In essence, the factors enunciated by the Illinois courts are aimed at determining whether the defendant has a direct connection to the operation which caused the injury, either in terms of continuing and substantial actual involvement with the work, or authority over, responsibility for, and knowledge of the conditions which caused the injury. *See, e.g., Chance, id.*

In *Fentress v. United States,* 431 F.2d 824 (7th Cir.1970), the United States was found to have charge of the work because a Federal Aviation Agency engineer was aware of and approved the use of a dangerous rope sling in order to speed up the work. The engineer had the contractual right to stop the use of such a sling and knowingly failed to exercise that right. *Id.* at 828. *Accord, Simmons,* 104 Ill.2d 444, 473 N.E.2d 946 (right to inspect and reject work, plus access and actual or constructive knowledge of the unsafe condition). The facts of *Fentress* are egregious when compared to the facts of this case, where neither Lynch nor anyone else knew of or approved the lack of proper safety equipment, or the chosen method of performing the work.

■ In the instant case, although the VA had the right to inspect the work and the right to order it stopped for the convenience of the government, there was no way it could exercise those rights. Under the contract, direct supervision and control were vested in Flood. But there was no way in which either Flood or the VA could have taken charge of the operation, since Phillips, in violation of his instructions and agreement, with notice to no one and using his equipment and personnel, went ahead on his own to do a hazardous job. Flood, the prime contractor did not learn about it until the morning of Phillips' death, when Phillips told Linda Flood that, though she was unaware of it, the work was well underway and would be finished in a few days and that he would let her know in advance when he would resume. He did not do so. As the prime contractor, Flood had the responsibility for supervision and control and was obligated by its contract with the VA to have a superintendent at the site whenever work was being performed.

There was no way that anyone could have charge of P & W's performance since Phillips told no one when he and his crew were going to work. Lynch did not learn

he was at work until just before the accident. Flood did not learn of it until after Phillips was dead. It is impossible to be in charge of activities that you do not know are going on. No one, other than Phillips himself, had charge of his actions.

■ The Act, the Illinois courts have held, imposes broad responsbility on owners and contractors for the protection of employees or subcontractors and their employees. It does not, however, make them insurers of employees or subcontractors who, in violation of their known obligation to inform the owner or contractor when they are going to engage in hazardous work, proceed to do so and are injured or killed. None of the cases cited by appellant so holds.

For whatever reason or reasons, Phillips engaged in obviously hazardous activities without notifying either the prime contractor, Flood, or the owner of the property, the VA. Neither had an opportunity to be in charge, to insist that additional safeguards such as a line limiting the possible fall distance or a net or other protective device be used in addition to the lineman's belt and strap. Whether or not they would have done so is now irrelevant since they never had the chance. The Magistrate's conclusion that the VA did not have charge of P & W and Phillips' operations at the time of the tragic accident is not clearly erroneous but is clearly correct.

It follows from the foregoing that the VA did not wilfully violate the Act or wilfully fail to comply with its provisions. A wilful violation means a knowing violation: "An owner is liable where the dangerous condition is known to him or when, in the exercise of reasonable care, the existence of the dangerous condition could have been known to him." *See, e.g., Gannon v. Chicago Milwaukee, St. Paul & Pac. Ry.*, 22 Ill.2d 305, 314, 175 N.E.2d 785, 790 (1961). Accordingly, the VA is not liable under sections 1 and 9 of the Act as charged in count I.

With respect to count II, charging the VA with liability under section 5 of the Act, the Magistrate found that Phillips was not a person employed or directed by the VA within the meaning of that section. Section 5 requires, in relevant part, that anyone who hires, employs or directs "another to perform labor of any kind in the ... repairing [or] altering ... of any water ... tower, when [a] ... swing, hammock, support ... or other similar contrivance [is] required or used," must maintain "a safe and proper scaffold, stay, support or other suitable device" below the working area to prevent anyone working at a height of 32 feet or more from falling more than 16 feet.

Appellant suggests that the VA-Floor-P & W contract-subcontract arrangement was merely a sham to satisfy the minority small business requirement, get some money to Linda Flood who was a friend of Lynch's and have P & W do the actual work. Accordingly, she contends, P & W and Phillips in reality were hired and employed by the VA.

■ While there may be some truth in appellant's contentions, the record does not bear them out. The contract was with Flood. Lynch met with King (Flood) and Wolinski (P & W) to discuss the performance of the contract and subcontract. It was made clear that Flood was the prime contractor and was responsible for supervising the work. It was understood that King would be the supervisor. It was also made clear that no work was to be performed by the subcontractor without prior notification to Flood and the VA. Lynch was certainly aware that Flood had subcontracted the work to P & W, in fact he had suggested it. That does not, however, make the VA the employer of P & W or Phillips.

Even if we assume that the VA hired or employed P & W and Phillips to perform the work, section 5 would not impose liability. The section requires the employer to provide a suitable device to prevent an employee from falling more than 16 feet "while such work is being done." If the employee makes it impossible for the employer to discharge that duty by proceeding

 

to work without notification to the employer, there is no way the latter can comply with the statutory requirement. Again, whether or not King or Lynch, had they known Phillips and his crew were at work at a height above 32 feet, would have insisted on a safety line, a net or a scaffold below where they were working is speculative and irrelevant. Phillips, by his conduct, made it impossible for them to do so. The Magistrate correctly found for the defendant on count II of the complaint charging a violation of section 5 of the Illinois Structural Work Act.

█ Count III, the final count, charges the VA with common law negligence which proximately caused Phillips' death. Again, the Magistrate found for the VA. The only action of the VA which it might be argued a reasonable person would not have done under the circumstances and which might proximately have caused Phillips' death was giving some representative of P & W the key to the tower enclosure on Friday, April 17. If the record contained evidence as to who issued the key, to whom, and particularly, what was said at the time about why the P & W crew needed or wanted the key, when they were going to work, what safety devices they intended to use, etc., it is conceivable that turning over the key might have been negligent conduct. As previously indicated, however, the record contains no such evidence.

Even if the delivery of the key to some P & W representative had been negligent, the question of proximate cause would still remain. A number of intervening factors obviously contributed to the accident. The condition of the belt which severed, the shoes Phillips was wearing, etc. It was a long time between the delivery of the key on Friday, April 17, to Phillips' death on Monday, April 20.

So far as any other action or inaction of the VA is concerned, Phillips' conduct in going ahead without notifying anyone foreclosed any possible negligence by the VA. The Magistrate correctly found for the VA on count III.

## V. *Conclusion*

For the reasons set forth herein, the decision and judgment of the Magistrate are affirmed.