Tomislav SAVIC, Plaintiff–Appellee,

v.

UNITED STATES of America,
Defendant and Third Party
Plaintiff–Appellant,

v.

KOVILIC CONSTRUCTION COMPANY,
INCORPORATED, Third Party
Defendant–Appellee.

No. 89–1399.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 13, 1990.

Decided Nov. 19, 1990.

Francis J. Marasa, James J. Graney, Georgene M. Wilson, Sweeney & Riman, Chicago, Ill., Bogdan Martinovich, Ray & Glick, Libertyville, Ill., Kenneth A. Helmin, Thomas J. Karacie, Katz, Karacie & Helmin, Chicago, Ill., for plaintiff-appellee.

Anton R. Valukas, U.S. Atty., Gail C. Ginsberg, Mark A. Flessner, Asst. U.S. Attys., Office of the U.S. Atty., Nancy K. Needles, Asst. U.S. Atty., Office of the U.S. Atty., Civ. Div., Appellate Section, Chicago, Ill., for U.S.

James J. Graney, Sweeney & Riman, Chicago, Ill., for Kovilic Const. Co., Inc.

Before WOOD, Jr., COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

The United States appeals the district court's finding of liability and the award of damages following a bench trial pursuant to the Illinois Structural Work Act, Ill.Rev. Stat. ch. 48, Pars. 60–69, and the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 in favor of Tomislav Savic. 702 F.Supp. 695. We reverse.

## I.

## FACTS

Tomislav Savic had been employed as a roofing laborer for Kovilic Construction Co., Inc. ("Kovilic") for approximately two weeks prior to his fall from a ladder, in which he sustained injuries to his arm, ribs, kidney and hip. Kovilic had contracted with the United States to strip and re-roof the canopies covering loading docks on three warehouses at the Great Lakes Naval Training Station in Great Lakes, Illinois.

The standard United States Government construction contract was used on this project and placed the responsibility for proper safety and health precautions on the contractor. Kovilic, the contractor, was required to submit a safety plan for the project, and the parties stipulated that a pre-construction conference was held at which the government, among other things, discussed Kovilic's responsibility for the safety of his employees and the administration of the contract, as well as the applicable labor standards.

The government retained the authority under the contract for general oversight of the project, such as the ability to stop work for any safety violations observed and the authority to change the construction specifications during the performance of the work. In the Accident Prevention section of the contract, the "Contractor" (Kovilic) was required to take actions necessary to ensure a safe workplace, but the Government only had the responsibility to "notify the Contractor of any noncompliance with the foregoing provisions and the action to be taken. The Contractor shall, after receipt of such notice, immediately take corrective action." At a later point in that section, the contract provided: "If the Contractor fails or refuses to comply promptly, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken."

The government employed two experienced construction inspectors whose responsibilities included general overseeing responsibilities of Kovilic's performance and ensuring quality control during the term of the contract. One of the inspectors, Mr. James Skonie, was a government employee, and the other, Mr. Joseph Szyszka, was an employee of an independent contractor.

On the particular portion of the roofing job where Savic was injured, Kovilic's workers climbed to the roof via an aluminum extension ladder. Even though there was a conflict in testimony between the government's construction representative and other witnesses dealing with the method of how the ladder was secured, the judge failed to state why he chose to believe that the ladder was attached by nails, rather than wire in spite of the fact that James Skonie, one of the government's construction representatives, testified that he recalled the ladder being tied and secured at the top with wire. There was also conflicting testimony at trial on the question of whether attaching the top of the ladder with nails was the safest method, but the two construction representatives and the plaintiff's ladder expert did agree that this method would have prevented the ladder from moving sideways and thus would have prevented the accident. At trial Savic testified that at the beginning of the work day on the morning of August 10, 1981 he climbed the ladder, and that the ladder was attached to the roof, as it had been in the past, and further, that he and one of his

co-workers moved a tar pipe [1] immediately prior to his accident. Moving the tar pipe necessitated the detachment of the ladder from the roof momentarily in order that the pipe might be passed behind it. Although it is unclear from the evidence whether Savic or his co-worker detached the ladder, it is clear that it was not reattached to the roof after the pipe had been moved. Immediately after moving the pipe, Savic was summoned by his supervisor (Nic Kovilic) to help him move some insulation on the ground. As Savic stepped on the ladder to descend, the ladder moved sideways, catapulting Savic to the ground, some eighteen feet.[2]

As a result of the fall, Savic injured his left elbow, fractured four ribs, damaged his left kidney as well as his left hip. After being awarded worker's compensation for his claim against Kovilic, Savic filed suit against the United States claiming violations of the Illinois Structural Work Act and common law negligence. The United States filed a third-party complaint against Kovilic Construction, on the grounds of common law indemnity, and later amended the third party complaint to include a claim under the Contribution Among Joint Tortfeasors Act, Ill.Rev.Stat. ch. 70, pars. 301–305. Over four years after the filing of the original third-party complaint, the trial judge refused to allow a further amendment by the United States, a claim against Kovilic for contractual indemnity, because of the lapse in time. Kovilic was dismissed from the action prior to trial after settling directly with Savic. *Savic v. United States*, 689 F.Supp. 854 (N.D.Ill.1988).

The court trial was bifurcated as to the issues of liability and damages. In the liability phase of the trial, the trial judge found the United States to be liable under the Illinois Structural Work Act but did not find common law negligence on the part of the United States. In its oral decision, the court found that the United States "had charge of" the project on which Kovilic was working, according to the Illinois Structural Work Act, because the government participated in the work beyond merely owning the property or employing an independent contractor, citing *Phillips v. United States*, 792 F.2d 639 (7th Cir.1986). The court further found that the method of attaching the ladder with nails to the building was an improper method of securing the ladder, was inadequate, and this was the proximate cause of Savic's injuries. The court also reasoned that the United States had willfully violated the Act, as the term "willful" is used under the Illinois Structural Work Act, in allowing this method of ladder attachment. Although the government inspectors' testimony conflicted on the question of whether the ladder was secured with nails or wire, both inspectors nonetheless agreed that attaching the ladder with nails would have complied with safety requirements. Despite extensive testimony in the record regarding the adequacy of the method of attachment using nails, the judge discounted the testimony of the government's expert witnesses, who testified concerning the attachment of the ladder and instead cited his "great deal of experience on ladders" as the basis for his findings.[3]

---

1. The tar pipe is a pipe which is used in pumping hot tar from ground level to the roof.

2. There was testimony at trial that Savic may have attempted to descend the ladder improperly, facing away from the building in descending it similar to a staircase. This evidence was based upon information which Nic Kovilic testified to hearing from Savic's co-workers after the accident, as well as the testimony of Emilio Spasojevic, who witnessed the final eight to ten feet of Savic's fall, and testified that he was falling face-forward. The judge found that there was no reliable evidence that Savic descended in this manner and found this evidence not to be credible. In his opinion, the trial judge stated that Savic would naturally have

turned his body in mid-air in order to be facing downward as he fell, but there was no evidence of this in the record.

3. Specifically, the trial judge stated in his oral findings:

"I have been a laborer in my life on more than one occasion, and as I say, even a homeowner gets a certain amount of experience with ladders. But I used ladders in the navy, I used ladders when I was a worker on the highways in the Commonwealth of Massachusetts many years ago, I washed trucks and moved things around for Rouan [sic] Motor Transport out in Iowa years ago, and I painted fences with creosote and buildings with

After having found liability on the part of the United States, the judge received evidence regarding Savic's damages, finding that Savic had sustained damages in the amount of $523,087.00.[4] After subtracting the $100,000.00 which Savic received as a result of the settlement with Kovilic, judgment was entered against the United States in the amount $423,087.00. The United States appealed.

## II.

## DISCUSSION

This case arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 ("FTCA"). The law which is to be applied is the law of the State of Illinois, "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

> creosote on ladders when I was a healthy young lad.
>
> I know without any difficulty at all the actions that this laborer was going through when he was attempting to get off that roof and on to that ladder."

**4.** The judge's damage award calculation contains many assumptions unsupported in the record. Savic had been a "laborer" prior to his accident, and was paid laborer's wages at $11.87 per hour, but the judge found that his future wage would be $16.50 per hour, stating that is what "experienced roofers" were making. The record fails to set forth his basis for finding where the $16.50 per hour came from (the evidence showed experienced roofers made $16.82 per hour) nor how Savic could be classified as an "experienced roofer." In calculating Savic's earning ability after the injury, the judge projected his future earnings at $5.50 per hour, and again we are unaware of the source of this figure. On the other hand, Kovilic testified that he paid Savic $10 to $12 per hour for approximately fifteen weeks in 1982, the year following the accident. Kovilic stated that Savic worked as a laborer and that Savic did not have any problems doing the tasks assigned to him. At the end of fifteen weeks, Savic was laid off because the winter season prevented outdoor construction work. Savic did not return to work the following spring.

**5.** Section 1 of the Structural Work Act, Ill.Rev. Stat. ch. 48, par. 60, provides, in pertinent part:

> "All scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this state for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, via-

The trial judge found that the United States was liable pursuant to the Illinois Structural Work Act, Ill.Rev.Stat. ch. 48, pars. 60–69.[5] In order to find liability under the Structural Work Act, the plaintiff must prove all of the following:

> "(1) The plaintiff was engaged in or was passing under or by a structural activity; (2) the activity was being performed with reference to a structure; (3) a scaffold or other mechanical device was being used; (4) a defect existed in the construction or use of the device; (5) the defect proximately caused the plaintiff's injuries; (6) the defendant had charge of the work being performed; and (7) the defendant willfully violated the Act's safety standard."

*Fisher v. Crippen*, 144 Ill.App.3d 239, 98 Ill.Dec. 183, 493 N.E.2d 1204, 1206 (1986)

> duct, or other structure, shall be erected or constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon."

A private cause of action arises under Section 9 of the Structural Work Act, Ill.Rev.Stat. ch. 48, par. 69, which provides in part:

> "Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act, shall comply with all the terms thereof, and any such owner, contractor, sub-contractor, foreman or other person violating any of the provisions of this act shall be guilty of a Class A misdemeanor.
>
>     \*      \*      \*      \*      \*      \*
>
> For any injury to person or property, occasioned by any wilful violations of this Act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured, for any direct damages sustained thereby; and in case of loss of life by reason of such wilful violation or wilful failure as aforesaid a right of action shall accrue to the surviving spouse of the person so killed, the lineal heirs or adopted children of such person, or to any other person or persons who were, before such loss of life, dependent for support on the person or persons so killed, for a like recovery of damages for the injuries sustained by reason of such loss of life or lives."

(citations omitted). On appeal, the United States disputes the district court's findings regarding whether it was "in charge of" the construction activities under the act, the defect in use which proximately caused the accident, and the government's willfulness in allowing the defective use to exist.

■ Findings of fact pursuant to FTCA and the Illinois Structural Work Act must be affirmed unless they are clearly erroneous. *Phillips v. United States*, 792 F.2d 639, 644 (7th Cir.1986). A finding is clearly erroneous when, although there may be some evidence to support it, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). "We may have such a conviction if the trial judge's interpretation of the facts is implausible, illogical, internally inconsistent or contradicted by documentary or other extrinsic evidence." *E.E. O.C. v. Sears Roebuck & Co.*, 839 F.2d 302, 309 (7th Cir.1988) (citations omitted).

The lack of written findings by the district court makes review difficult. *See Jones v. Jones Brothers Construction Corp.*, 879 F.2d 295 (7th Cir.1989). In *Jones*, this court remanded because it felt that "the district court's opinion makes review difficult because the limited number of specific findings do not sufficiently identify the evidence or credibility determinations upon which they were based and reflect certain inconsistencies." *Jones*, 879 F.2d at 297. In the present case, however, the transcript of the court's oral opinion does reflect a sufficient amount of information for us to glean the basis for the court's relevant findings in order that this court might make a valid determination of the propriety of those findings.

### A.
### Whether the United States "had charge of" the Project

■ Whether the United States "had charge of" Kovilic's roofing operation, which is the sixth element under *Fisher*, is a question of fact, to be reviewed under the totality of circumstances standard. *Gentile v. Kehe*, 165 Ill.App.3d 802, 117 Ill.Dec. 476, 478, 520 N.E.2d 827, 829 (1987). Illinois courts have determined that more than one entity can "have charge of" a project, *Fruzyna v. Walter C. Carlson Associates, Inc.*, 78 Ill.App.3d 1050, 34 Ill.Dec. 385, 388, 398 N.E.2d 60, 63 (1977), but a number of factors (10) must be considered in determining whether or not a particular defendant "has charge of" (responsibility for) the project under the parameters of the Structural Work Act.

> "These factors are: (1) supervision and control of the work; (2) retention of the right to supervise and control the work; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) responsibility for taking safety precautions at the job site; (6) authority to issue change orders; ... (7) the right to stop the work; ... (8) ownership of the equipment used on the job site; (9) defendant's familiarity with construction customs and practices; and (10) whether defendant was in a position to assure worker safety or alleviate equipment deficiencies or improper work habits."

*Chance v. City of Collinsville*, 112 Ill. App.3d 6, 67 Ill.Dec. 747, 750, 445 N.E.2d 39, 42 (1983) (citations omitted); *Gentile*, 117 Ill.Dec. at 478, 520 N.E.2d at 829. The government would be found to be "in charge of" Kovilic's project if the totality of these factors weighs in favor of such a finding. As with the defendant landowner in *Gentile*, the government should not be held liable for "merely requiring compliance with the contract and insuring the quality of the work." *Id.* 117 Ill.Dec. at 479, 520 N.E.2d at 830. In *Fruzyna*, an architect was not found to be "in charge of" the contractor's work even though he was familiar with the type of work being performed and had the right to reject work for inferior quality. *Fruzyna*, 34 Ill.Dec. 391–92, 398 N.E.2d at 66–67.

■ Supervision and control of Kovilic's work would require day-to-day control of

the workers and the details of the work, as in *Emberton v. State Farm Insurance*, 71 Ill.2d 111, 15 Ill.Dec. 664, 373 N.E.2d 1348 (1978), where the numerous daily change orders by the architect amounted to day-to-day control. Retention of this right is also significant, even if it is not exercised. Constant participation would require an ongoing presence and involvement in the day-to-day work. The very language of the contract as well as Kovilic's understanding of the situation establishes that responsibility for safety precautions rest clearly upon Kovilic and not the United States.

The government did meet the sixth and seventh elements, retaining authority to change specifications and stop work if necessary. Ownership of equipment, however, was clearly not a factor in favor of a finding that the government was in charge, because Kovilic owned and his employees operated the equipment used at the site. The government representatives were familiar with construction practices, the ninth element. However, based upon the record, it is at best highly questionable and nigh unto impossible for the government to be in a position to assure worker safety or alleviate equipment deficiencies or improper work habits (the tenth element), given that the government inspectors visited the construction site only once or twice during an ordinary work day.

The district court did make reference to some of the appropriate factors for determining whether the United States had charge of the project, referring to *Mathieu v. Venture Stores, Inc.*, 144 Ill.App.3d 783, 98 Ill.Dec. 684, 494 N.E.2d 806 (1986) and *Kohutko v. Four Columns, Ltd.*, 148 Ill. App.3d 181, 101 Ill.Dec. 198, 498 N.E.2d 522 (1986). Specifically, the district court said "that the government had a sufficient degree of supervision and control," because "the United States inspected the work, they oversaw the work, and in the opinion of the court, they had a right to control the work. Whether or not that right was exercised constantly in the fullest sense of the word, I believe they did." However, the judge did not provide an analysis nor examples of what he relied upon in support of this statement. Additionally, the district court found that the government "retains the right to supervise and control," and that the government was not "constantly on location, but they were on location several times a day every day for a number of days." Even though he found that the government was not on location constantly, the judge found that the United States was "in total control of the circumstances of the base," citing the United States' ownership and general supervision of the property.[6] The testimony demonstrated that the government inspectors climbed the ladders but one or two times per day, when they wished to inspect the installation of roofing material as well as the quality of the same pursuant to the terms of the contract; and at these times they testified they took notice that the ladders were attached to the roof.

Regarding safety, the district judge cited the pre-construction conference at which safety, along with numerous other administrative details, was discussed by representatives of the government and the contractor. The government was responsible for monitoring compliance with the contract which included the ability to stop work for quality control problems; however, section 45 of the contract between the government and Kovilic placed responsibility[7] for accident prevention upon Kovilic. In demonstrating that the government had a right to control the work, the judge cited testimony by Sherman Barnett, the Navy's project

---

6. Using such reasoning, one could easily envision a situation where the government would be found to be "in charge of" work being performed by an employee of a private security system firm who was injured during the installation of the security system in a government building simply because of the United States' ownership and supervision of the property.

7. The relevant portion of section 45 states:

"(a) In order to provide safety controls for protection to the life and health of employees and other persons ... the Contractor [Kovilic] shall comply with all pertinent provisions of Corps of Engineers Manual ... and will also take or cause to be taken such additional measures as the Contracting Officer may determine to be reasonably necessary for the purpose."

manager for this and all other construction projects at Great Lakes Naval Training Station, that he could make Kovilic change the asphalt bucket, although no evidence established that changing the asphalt bucket would be a safety precaution, rather than an aspect of quality control.[8] From this unexplained evidence, the judge came to the conclusion that "if you can stop them from using an asphalt bucket, you can certainly stop them from inadequately supporting a ladder." The district court found that the government could have stopped the work at any time, that the government was "surely and clearly familiar with construction customs and practices" related to this job because the inspectors were highly experienced in the construction industry, and that the government "did indeed have the ability to assure workers' safety" because of the inspectors' ability to "point out the lack of compliance and the necessity of complying," as provided in the contract.

The factors regarding whether a party "has charge of" a project under the Illinois Structural Work Act are aimed at determining whether a particular defendant has a depth of involvement in the project beyond mere ownership of the property or employment of the contractor, which was the case in *Phillips*. Being "in charge of" a project consists of a "continuing and substantial involvement with the work, or authority over, or responsibility for, and knowledge of the conditions which caused the injury." *Phillips*, 792 F.2d at 645. "Mere ownership, without more, is insufficient to establish liability under the Structural Work Act." *Norton v. Wilbur Waggoner Equipment Rental*, 76 Ill.2d 481, 31 Ill.Dec. 201, 204, 394 N.E.2d 403, 406 (1979). The owners in *Emberton* were found to have charge of the work where they were at the work site every day, sometimes all day, attended the contractor's weekly progress meetings with subcontractors, and issued over a hundred change orders on all aspects of the project, acting

over and above mere ownership or the employment of a contractor.[9] *Emberton*, 15 Ill.Dec. 668–69, 373 N.E.2d at 1352–53. In *Phillips*, the United States was not "in charge of" work on its own property when it had no idea of the progress of the work when the accident occurred or the particular methods being used in that work. *Phillips*, 792 F.2d at 645.

The United States argues, and we agree, that only three of the ten factors from *Chance* would support a finding that it was "in charge of" the work being performed by Kovilic: the authority to issue change orders, the right to stop work (*only when it does not comply with contract specifications*), and familiarity with construction customs and practices; the other seven factors applied to Kovilic. Thus, under the totality of the factors from *Chance*, we firmly believe that the United States was not "in charge of" Kovilic's roofing project, for purposes of the Structural Work Act.

As to the first two factors, the judge found that the United States had "a sufficient degree of supervision and control" for him to find that the United States "had charge of" the work, although he failed to delineate or explain his reasoning, much less the difference between "sufficient" and "insufficient." However, Mr. Barnett, the Navy's project manager, and Nic Kovilic both testified to the fact that the government did not have a right to control the work of the contractor, except when the *quality* of the work did not comply with the contract's specifications. The main duty of the inspectors was to ensure not only the quality of the material used but also compliance with the contract specifications as to installation. Although the contract mentioned safety, it clearly assigned the duty for maintaining a safe operation to the contractor Kovilic: "In order to provide safety controls ... the Contractor shall comply with all pertinent provisions of [the] Corps of Engineers Manual ... entitled 'General Safety Requirements.' "

---

**8.** Indeed, the record reveals that Barnett testified that the government inspectors could order the asphalt bucket changed to make a "correction on it."

**9.** In contrast, there was no testimony in this case of the government inspectors' ever submitting even a single change order.

The United States' inspectors testified that they would only become involved with the work of the individual laborers when and if they observed immediate danger to "life and limb, where someone could get hurt," but that this situation never became necessary during Kovilic's roofing project. Otherwise, section 45 of the contract required any comments or requests for changes in the contract provisions to be channeled through the contractor's supervisor on the site. The contract required Kovilic "to have on the work [site] a competent superintendent" at all times, with authority to act for the contractor. The evidence regarding the United States' authority to enforce safety regulations and control the work, except as to quality control, established that the government did not have or retain the right to supervise and control the day-to-day work of Kovilic, and neither Savic nor the court have cited any evidence to contradict that conclusion, thus failing to support the trial court's finding as to supervision and control, as well as retention of that right, the first two factors under *Chance*.

■ Regarding the third factor, "constant participation in ongoing activities at the construction site," the trial judge stated "they weren't constantly on location, but they were on location several times a day every day for a number of days." The judge made no finding, however, and the evidence fails to demonstrate that the government's limited presence at the site amounted to "participation" in the work. The government's periodic inspections fail to fall within the parameters of continual supervision. Kovilic testified that the inspectors usually just "came up and talked to you ... and asked you questions" about the activity, and that after the start of the project "they kind of slack off." In finding that the government was constantly participating in the ongoing activities at the site, the judge reached out beyond the contractually stated responsibilities and the evidence presented. This factor cannot weigh in favor of the government being in charge of the project, for the government did not participate "constantly." Moreover, this court has previously held that government inspection of work being performed by an independent contractor is not enough to place the government "in charge of" the work. *Cannon v. United States*, 328 F.2d 763, 765 (7th Cir.1964). The fact that the government had retained two inspectors who, from time to time, inspected the work being performed by Kovilic's employees did not place the government "in charge of" the work. This is especially so, given that the government inspectors were also responsible for making inspections of as many as twenty other work sites each day.

The terms of the contract established that the responsibility for ensuring safety precautions at the job site was upon Kovilic, the fifth of the *Chance* factors. That responsibility for safety was affirmed at the pre-construction conference. Nic Kovilic, at trial, was asked "you assumed responsibility for the safety of your employees, did you not?" Kovilic answered "yes." When asked whether the "government [had] responsibility for taking safety precautions at the job site," Mr. Barnett, the Navy's project manager, replied "no." When asked whether the inspectors had the authority to stop the project, Mr. Barnett replied that "The only way they could stop a phase of the project would be if they saw some thing unsafe [such as] in the case of endangerment of life or limb or property." Both government inspectors made similar statements. The government was not in the position to assure workers' safety because, under the terms of the contract it had delegated this responsibility to the contractor. Furthermore, we decline to hold that mere government inspection of work being performed by an independent contractor to assure that the independent contractor is following necessary safety precautions is, by itself, enough to shift the responsibility for taking safety precautions to the government. To do so would create a disincentive for the government to ever become involved in ensuring that work by an independent contractor is performed in a safe manner.

Regarding *Chance*'s eighth factor, Kovilic owned, maintained and operated the equipment used at the job site, including

the portable ladder upon which Savic was standing when he suffered his injuries.

Because seven of the ten *Chance* factors mandate our holding that Kovilic had complete safety responsibility on the roofing project, we reverse the district court's finding that the government "had charge of" the project. While the government maintained some responsibility regarding the authority to issue change orders concerning installation and quality of the material and was familiar with the construction activities as an owner, in our opinion the contract entered into between the government and Kovilic, as well as the practice on the job site, clearly placed the responsibility of safety on the contractor, Kovilic Construction Co. When asked whether he agreed with the statement "the Government would turn over the plans and specifications to you and then you were responsible for performing the work," Nic Kovilic responded "yes." Although the district court judge found some of the factors to weigh in favor of the government being "in charge of" the project (like familiarity with construction practices and the ability to issue change orders), our review of the record considered in its totality reveals that the judge erroneously found liability on the government, based upon what he referred to as his "experience on ladders." Because the evidence fails to support the trial judge's finding that the government acted above and beyond the role of a mere property owner or the hiring of a contractor, we hold that the trial judge's finding that the government "had charge of" the project for purposes of establishing liability under the Illinois Structural Work Act was erroneous.

### B.

### Defect in Use of the Ladder

■ Our holding that the United States was not "in charge of" the roofing project when Mr. Savic was injured would itself preclude a finding of liability against the United States under the Structural Work Act, but we feel that we are obligated to discuss the other grounds which compel this reviewing court to reverse the district court's finding of liability against the United States under the Act. The trial court found that the manner of securing the ladder to the roof was the defective use of the ladder which proximately caused Savic's injuries, and that the United States willfully allowed the existence of that defect. The trial court failed to recognize the defect in the use of the ladder which clearly caused Savic's injuries: *The ladder was not attached to the roof when Savic stepped upon it and fell because either Savic or his co-worker had detached it immediately prior to Savic stepping upon it and falling.* Based upon the record before us we fail to understand how the United States could be found to have willfully allowed that defect to exist.

The district court referred to three different defects in the use of the particular ladder which it felt caused the accident. First, the court felt that the method by which Kovilic secured the ladder at the top was inadequate to support the weight of the ladder and the people climbing it. Second, the court found that the ladder was not consistently secured at the bottom. Third, the court found that the ladder was too short, not extending high enough over the edge of the roof. As will be shown later, all three of these defects are immaterial (even if we agreed with the findings, which we do not) because the *proximate cause* of the accident was that the *ladder was not attached to the roof when Savic fell.* The court also found that since the United States "had charge of" the project and "willfully" allowed these conditions to exist, as that term is defined in cases under the Illinois Structural Work Act, all the necessary elements for liability under the Act were satisfied.

There is evidence regarding the three defects which the court found (the improper attachment at the top, improper attachment at the bottom, and insufficient projection above the roof), but the findings as to whether these defects existed is irrelevant because the record clearly illustrates that none of these factors caused Savic's accident. The evidence in the record establishes that Savic's accident occurred be-

cause the ladder had been detached from its moorings immediately prior to the accident and not re-attached to the roof before Savic attempted to descend. This detachment of the ladder was the defect in use which was the proximate cause of Savic's accident. Savic had been working on the roof for over two weeks, having climbed the ladder "hundreds of times" during that period, and his own testimony reveals that the ladder had never previously been detached from the roof without being immediately re-attached. Savic or his co-worker pulled the ladder from the nails which secured it to the roof in order to move the tar pipe, and failed to re-attach it. The detachment of the ladder was a defect in use, but under no circumstances can the United States be found to have willfully allowed this defect to exist because it had no knowledge of the momentary detachment and lack of reattachment of the ladder. How the government can be faulted for an accident of this nature we are at a loss to understand.

The district court "believe[d] that the ladder was lower than it should have been in its projection above the roof," and found that this was a contributing cause of the accident. The parties stipulated that the roof was 18 feet, 8¾ inches above the ground, and that the ladder in the possession of Kovilic's insurance company was 20 feet, 1 inch in its usable length (the maximum usable length is based upon a full extension of the ladder with a safe overlap of the two sections). The plaintiff's expert based his testimony on these stipulated facts, including the measurement of the ladder, to conclude that the ladder was too short to safely reach the height of the roof,[10] which actually may not have been the ladder used at the time of the accident.[11] Upon cross-examination, however, the expert stated that the purpose of the three-foot projection requirement was to

provide a hand hold at the top of the ladder for persons getting on or off the ladder. He further testified that a violation of the regulation would not have caused the ladder to fall as Savic described it as falling because grasping a falling ladder upon which he was standing would not have prevented the fall. The trial judge relied upon the testimony of the plaintiff's expert as to the safety of the ladder as to its height in relation to the height of the roof (which had been discounted on cross-examination by a showing that the three-foot projection would not have prevented the accident), and again relying upon his own personal experience as a laborer in deciding that the violation of the three-foot projection requirement, combined with the nail method of securing the ladder, were the proximate causes of Savic's accident.

The competent testimony regarding the proximate cause of Savic's accident set forth that Savic fell because the ladder was not secured to the roof at the time when Savic stepped upon it to descend. The plaintiff Savic was the only eye-witness to the beginning of the fall, and in his testimony at trial he stated that the ladder was not attached to the roof when he started down. He further testified that he had climbed the ladder perhaps twenty to thirty times per day for two weeks and had never seen it detached from the roof before. The plaintiff's expert, Charles Schulz, cited as one of three reasons for the cause of the fall, along with the projection of the ladder above the roof and the improper pitch of the ladder (both of which according to the transcript were discounted as causes on cross-examination) was the fact that the ladder was not attached at the time when the plaintiff stepped upon it to descend. Nic Kovilic, who was Savic's supervisor on the job and had asked Savic to descend to help him, testified that he saw the ladder detached by Savic or one of his co-workers

---

**10.** OSHA standards require the side rails of a ladder to "extend not less than 36 inches above the landing." 29 C.F.R. § 1926.450(a)(9).

**11.** Kovilic testified that he was not certain that the ladder which he had provided to the insurance company a few months after the accident was in fact the ladder that was used by Savic at

the time of the accident. Because the plaintiff's expert witness based his testimony on his inspection of a ladder that may not have been the ladder used at the time of the accident, we find it hard to understand how the trial judge gave credence to the plaintiff's expert's testimony.

when they moved the tar pipe, but that he paid no attention to whether the ladder was re-attached. He assumed that the person who detached the ladder would re-attach it.

The fact that the ladder was detached when Savic stepped upon it to descend it was the proximate cause of the accident. The trial court's finding that the method of attachment (whether adequate or not), or the height of the ladder's projection above the roof caused the accident is unsupported in the record and thus clearly erroneous.

### C.

#### Willfulness of the United States

◾ Since there was a defective use of the ladder, and that defective use was the proximate cause of the accident, our analysis requires a discussion of whether the violation of the Act's safety standard was a willful violation by the United States.[12] Under the Illinois Structural Work Act, "a willful violation occurs when one having charge of the work knows that a dangerous condition exists on the [ladder] or, by the exercise of reasonable care, could have discovered the existence of the dangerous condition." *Simmons v. Union Electric Co.*, 104 Ill.2d 444, 85 Ill.Dec. 347, 351, 473 N.E.2d 946, 950 (1984); *Dickman v. Midwest Interstate Electric Construction Co.*, 143 Ill.App.3d 494, 97 Ill.Dec. 551, 554, 493 N.E.2d 33, 36 (1986); *Moore v. Clearing Industrial District, Inc.*, 64 Ill.App.3d 391, 20 Ill.Dec. 854, 380 N.E.2d 1063 (1978). The trial judge based his finding of willfulness on the fact that the government had knowledge of the method of attachment and the height of the ladder, defects which we hold not causal of the accident.

The government inspectors, Skonie and Szyska, as well as Savic, Kovilic, and Emilio Spasojevic all testified that previously the ladder had always been attached when persons were climbing upon it. The only testimony at trial that the ladder may not have been attached at any time previously was the deposition testimony of Marko Le-

tica. However, the credibility of Letica's testimony was questionable because he contradicted himself regarding whether he quit or was fired from his employment with Kovilic and the length of time he had been planning the trip which prevented him from being present at the trial. Obviously, the trial judge did not rely upon his testimony, for he made no mention of Letica's deposition testimony in his findings, but rather again relied upon his own personal experience. The judge stated, "I think they [the government inspectors] were lax and lazy, and I think that under the circumstances it all constitutes a willful" violation, apparently implying that the United States knew of dangerous conditions, was responsible for changing them and simply decided to do nothing about them. A willful violation of the Illinois Structural Work Act requires that the party "in charge of" the operation know of the defective condition: "An owner is liable where the dangerous condition is known to him or when, in the exercise of reasonable care, the existence of the dangerous condition could have been known to him." *Phillips v. United States*, 792 F.2d 639, 646 (7th Cir.1986). We disagree with the trial judge's finding that the government willfully violated the Act because, based on the overwhelming weight of the credible evidence, it is clear that the United States, through its agents, had no knowledge that the ladder had previously been detached from the nails when in use.

The United States did not know, nor could its agents reasonably have anticipated, that the ladder would be unattached and thus used improperly. Furthermore, Kovilic Construction was "in charge of" the project, and their actions did not depend upon the government's presence at the site: (1) Kovilic furnished the ladders, (2) Kovilic employees secured the ladders, (3) Kovilic employees detached the ladder, and (4) Kovilic employees failed to re-attach the ladder. The periodic inspections of the United States' agents for quality and con-

---

**12.** As we mentioned previously, our holding that the United States was not in charge of the roofing project would itself preclude a finding of liability against the United States under the Structural Work Act. However, we feel it necessary to discuss the other grounds which compel a reversal of the district court's finding of liability against the United States.

tract compliance cannot be expected to detect every momentary change in conditions at the work site, including each of the 20 to 30 daily ascents and descents of the ladders by Kovilic's 10 to 20 employees.

The United States did not know, and there was no reason that the United States should have known, of the momentarily defective condition in the detachment of the ladder. When there is no notice of unsafe activities, there can be no finding of liability under the Illinois Structural Work Act. *See Phillips, supra.* The district court's finding that the United States willfully allowed the defective condition which caused the accident to occur is clearly erroneous because it does not apply to the defect in use which caused Savic's accident. From our review of the record, we are unable to ascertain any willfulness on the part of the United States in allowing the existence of the defective condition which caused Savic's injury. No act or omission of the United States was a proximate cause of Tomislav Savic's injuries, but clearly, the proximate cause of the accident was the detachment of the ladder by Savic himself, or his co-worker, with the government's inspectors nowhere near the scene.

### III.

### CONCLUSION

"This is [another] one of those relatively rare cases in which we are left with a 'definite and firm conviction' . . . that the district judge erred in a finding of fact." *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 589 (7th Cir.1989) (citations omitted). A finding is clearly erroneous when, although there may be some evidence to support it, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). The district court judge, rather than relying upon the evidence in the trial record, relied on his own personal experience regarding the course of events which

led to Tomislav Savic's fall and his subsequent injuries. We are of the opinion that the trial judge's interpretation of the evidence at trial fails to support the judge's findings dealing with the cause of the accident, while the true proximate cause of the accident was abundantly clear from the trial record. We hold that the United States is not liable under the Illinois Structural Work Act for the injuries Tomislav Savic received as a result of the fall from the ladder at Great Lakes Naval Base. The judgment against the United States is

REVERSED.