DONALD BURGER, Plaintiff-Appellant, v. PRAIRIE DEVELOPMENT, LTD., Defendant-Appellee (Dayton Resources, Ltd., *et al.*, Defendants).

First District (4th Division) No. 1—90—2913

Opinion filed August 22, 1991.

Burke & Burke, Ltd., of Chicago (John M. Burke and Thomas M. Lake, of counsel), for appellant.

Schoen & Smith, Ltd., of Chicago (Lee J. Schoen, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, Donald Burger, sustained injuries when he fell off a ladder at a construction site. He is suing several defendants, including the owner of the real estate, Prairie Development, Ltd. Prairie successfully moved for summary judgment and was dismissed from the litigation. Burger appeals from that judgment, contending that the court erred in its conclusion that Prairie was not "in charge of" the work for purposes of liability under the Structural Work Act (Ill. Rev. Stat. 1987, ch. 48, par. 60 *et seq.*). Burger also contends that the trial court mistakenly allowed Prairie to absolve itself of liability under a "hold harmless" agreement with the general contractor and that Prairie had

an independent duty to Burger under tort principles of landowner liability.

We affirm the trial court's entry of summary judgment in favor of Prairie.

BACKGROUND

Burger was taping drywall at a construction site owned by Prairie when he fell off of a ladder. Count I of his complaint alleges that various defendants violated the Structural Work Act (Ill. Rev. Stat. 1987, ch. 48, pars. 60 through 69). Count II alleges that the defendants were negligent in failing to provide proper and adequate protection to plaintiff in the performance of his work. The trial court granted summary judgment in favor of Prairie and also entered a finding that there was no just reason to delay enforcement of or appeal from the order. The litigation remains pending against other defendants.

At the time of his injuries, Burger was an employee of Levy Company, the drywall subcontractor engaged by the general contractor, Dayton Resources, Ltd., and S. Ballis, both of whom are defendants in the lawsuit. Burger is also suing Bryce, Inc., construction manager of the project, and Gustaf-Lindberg Company, the manufacturer of the wooden ladder from which Burger fell. Roy H. Kruse and his architectural firm have been dismissed from the pending action.

The site of Burger's injuries is 933 W. Wrightwood, where 33 townhomes were being constructed. Prairie held title to the property and provided all of the financing for the development of the project. Prairie is a service corporation owned by Pathway Financial Institution.

The record contains the deposition of Prairie's president, Ronald Reichert, who signed the "Building General Contractor Agreement" on behalf of Prairie. Also of record is the deposition of Steven Ballis, who signed the contract on behalf of the general contractor, Dayton Resources. Under the contract, Prairie was to purchase the real estate and obtain the deed. Dayton's obligation was to direct the construction of the townhomes. Prairie was to review the architectural plans and specifications, as well as a marketing program. Upon approval of the plans, Dayton would begin construction. Prairie agreed to pay all costs of construction, in exchange for 50% of the profits from sales of the units.

Reichert testified that he visited the construction site at least twice a month, pursuant to the general contractor's requests for interim payments, or draws. Under the contract, Prairie would not be obligated to approve the draws until it checked to see that the work

for which payment was requested had been completed. Prairie reserved the right to terminate the contract and take over the project if Dayton became unable or unwilling to perform under the contract. In the pending case, however, Prairie never stopped the work or interfered in the construction activities. Prairie also had the right to issue or approve change orders of $1,000 or more, pursuant to the construction contract. Prairie bore the risks of loss during the period of construction. If any extra work or change order of a significant nature was deemed necessary by Dayton, Prairie retained the right to be consulted before the change order was implemented.

Steven Ballis, president of Dayton, testified at his deposition that Prairie's role was "to provide the funding for the project and then whatever role it had as overseer on behalf of its own entity and act as owner." Ballis acknowledged that Prairie sent people to inspect the work periodically and testified that he believed they were there to verify that the work had in fact been performed so that payment could be approved.

In its motion for summary judgment, Prairie argued that there was no issue of material fact under count I, the Structural Work Act claim, because there was no evidence Prairie was "in charge" of the work. Prairie further challenged count II on the grounds that Burger was the employee of an independent contractor, Levy, and therefore Prairie had no special duty in negligence because it retained no control or supervision over independent contractors. Further, Prairie argued that a landowner owes no duty to warn an independent contractor of the obvious and normal hazards incident to the work performed.

OPINION

I

Burger charges that the trial court improperly tried issues of fact. He cites a number of cases for the proposition that whether a person or entity is "in charge of work" under the Act is to be resolved by the trier of fact. (See, *e.g., McKanna v. Duo-Fast Corp.* (1987), 161 Ill. App. 3d 518, 515 N.E.2d 157; *Scrimager v. Cabot Corp.* (1974), 23 Ill. App. 3d 193, 318 N.E.2d 551.) While we acknowledge the general accuracy of that statement, factual questions nonetheless may be determined as a matter of law if the evidence presented is insufficient to raise a genuine issue of material fact. See, *e.g., Winter v. Davis* (1980), 85 Ill. App. 3d 912, 407 N.E.2d 696; *cf. Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 394 N.E.2d 403.

■ There is no all-encompassing test to guide the courts in deciding whether a particular defendant had charge of the work as that concept is understood under the Act. (See *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 211 N.E.2d 247; *Simmons v. Union Electric Co.* (1984), 104 Ill. 2d 444, 473 N.E.2d 946.) Courts have listed various factors that may bear on the decision in a particular case, however. These include a consideration of whether the defendant (1) supervised and controlled the work; (2) retained the right to supervise and control; (3) constantly participated in the ongoing activities at the construction site; (4) supervised and coordinated the subcontractors; (5) took responsibility for safety precautions at the jobsite; (6) had the authority to issue change orders; (7) had the right to stop the work; (8) owned the equipment at the jobsite; (9) was familiar with construction customs and practices; and (10) was in a position to assure worker safety by correcting unsafe habits and equipment deficiencies. (*E.g., Simmons*, 104 Ill. 2d 444, 423 N.E.2d 946; *Gentile v. Kehe* (1987), 165 Ill. App. 3d 802, 520 N.E.2d 830, *appeal denied* (1988), 121 Ill. 2d 569, 526 N.E.2d 830.) These factors may be viewed as focussing on two hallmarks of being "in charge": (1) actual or clearly implied control and supervision over the construction; and (2) responsibility for job safety.

■ While an owner of property may exercise such control and supervision over construction as to make him liable to an injured party under the Act, the mere fact of ownership has little to do with which party or parties actually "have charge" of it. See *O'Rourke v. Oehler* (1989), 187 Ill. App. 3d 572, 543 N.E.2d 546 (mere ownership of premises or retention of right to reject or stop work is not enough for liability under Structural Work Act); *Winter v. Davis* (1980), 85 Ill. App. 3d 912, 407 N.E.2d 696 (owner of house was not liable under the Act for painter's injuries even though owner had suggested method of work and directed worker's attention to missed spots; owner did not direct the work, was not generally present while work was done, and was not involved in erection and placement of scaffolding).

■ A defendant cannot be held responsible for injuries sustained at the jobsite unless there is a "showing that he had some *direct connection with the construction operations.*" (Emphasis added.) *McGovern v. Standish* (1976), 65 Ill. 2d 54, 67, 357 N.E.2d 1134 (architect was not liable where his function was limited to general overseeing); *cf. Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 373 N.E.2d 1348 (architectural firm with authority to stop work was found to be in charge where its project representative was present on jobsite continuously for more than three years).

The facts of record are not in dispute; rather, the parties disagree as to the inferences that may be drawn from the facts. The depositions and the construction contract indicate that Dayton, as general contractor, was responsible for the day-to-day construction operations, including the hiring of subcontractors and directing the actual work activities. Prairie, on the other hand, was the financing entity for the project and maintained a periodic presence at the site to ensure that the contractors' draws were justified by the work being completed. Prairie's visits to the site to ensure that specific draws were justified differ markedly from Dayton's ongoing presence as general contractor responsible for all phases of construction.

Notwithstanding the different roles of the general contractor and owner in this case, Burger argues that several of the "in charge" factors are present and therefore the issue should go to a jury. While we do not believe that the courts must examine each separate factor in a mechanical application, we recognize that a party's right to summary judgment must be free of doubt. Accordingly, we will consider each factor as it relates to Prairie's actual or implied control of the work or responsibility for safety.

Burger's first, and primary, contention is that Prairie controlled and supervised the construction because Prairie's representatives visited the construction site at least twice a month and while there inspected the improvements to make certain the work was being done in a workmanlike manner. From this right of inspection, Burger leaps to the conclusion that Prairie undertook a direct responsibility for jobsite safety, speculating, "Surely, PRAIRIE looked for unsafe conditions during such inspections." We find this to be unsupported by any evidence of record; on the contrary, Reichert testified in his deposition that he did not look for defective conditions because that was not his job. An example of the type of inspection he conducted was checking to see that 10 garage doors were installed if Prairie was being billed for 10 garage doors.

■ Liability under the Structural Work Act is not automatically triggered when one who makes periodic site inspections for a limited purpose also has an incidental opportunity to observe unsafe conditions. If a person is not otherwise found to be in charge of the work, mere failure to inspect for unsafe conditions is not a ground for liability, at least unless that person's responsibilities include safety precautions. (See *Diomar v. Landmark Associates* (1980), 81 Ill. App. 3d 1135, 401 N.E.2d 1287 (affirming summary judgment in favor of architect, who did not have authority to stop the work because of hazardous conditions and who was to make only periodic visits to the site).) In

*Diomar,* as in the pending case, the defendant's inspections encompassed defective workmanship but not unsafe conditions.

■ Burger does not allege that Prairie was on notice of any unsafe conditions at the work site or that Prairie was overseeing the operations involving the ladder at the time of the injury. It is true that a party may be found to be in overall charge of work even if not directing the particular operations during which an injury occurs. (See *MFA Mutual Insurance Co. v. Crowther, Inc.* (1983), 120 Ill. App. 3d 387, 391, 458 N.E.2d 71.) Before a defendant can be found liable for a "willful" violation of the Act, however, the evidence must show that he knew or should have known of the defective condition; he cannot be held strictly liable for all injuries that may occur. (See *Smith v. Central Illinois Public Service Co.* (1988), 176 Ill. App. 3d 482, 531 N.E.2d 51, *appeal denied* (1989), 124 Ill. 2d 562, 535 N.E.2d 921; see also *McKanna v. Duo-Fast Corp.* (1987), 161 Ill. App. 3d 518, 515 N.E.2d 157.) In *McKanna,* the court upheld a jury's verdict against an owner in favor of the deceased worker who fell from a ladder. There, the evidence showed that the owner of the building exercised exclusive control over the boiler room ladder from which the worker fell, the room was kept locked, and the owner knew the ladder was defective and had even instituted a rule against its use.

■ Burger next argues that the parties' contract gave Prairie the *right* to supervise and control the work, even if the right was not exercised in the pending case. The grounds for this argument are these contractual rights: (1) Prairie was to notify the general contractor of any defects in the work that Prairie observed; (2) Prairie could terminate the agreement if Dayton defaulted in the performance of its obligations; and (3) Prairie could issue or approve change orders. (This argument encompasses the second, sixth, and seventh factors of the *Simmons* formulation.)

We do not agree that these contract rights support an inference that Prairie maintained the right to control and supervise the construction as contemplated under the Act. Under its contract with Dayton, Prairie's primary role was to pay the money. Prairie's periodic, on-site visits were meant to ensure that the terms of its contract with Dayton were being fulfilled, not to oversee and direct the workers responsible for adhering to the plans and specifications of the project. Nothing in the contract suggests that Prairie was to take an active and direct role in the construction itself.

The contract between Prairie and Dayton stated that the "General Contractor [Dayton] is an independent contractor and not an employee, partner or joint venturer of the Owner. Except for the Owners'

payment and other obligations as set forth in this Agreement, the Owner shall have no liability with respect to the liability arising from the acts or omissions of the General Contractor, its agents, employees and contractors." In defining the respective parties' contractual rights and duties, the contract charged Dayton with responsibility for constructing each unit and the common areas "of good materials and in a first-class, workmanlike manner and substantially in accordance with [the plans and specifications]. If the Owner becomes aware of any fault or defect in the work or non-conformance with the plans and specifications, Owner shall give prompt written notice thereof to the General Contractor."

Without checking on the work in progress, Prairie would not be able to notify the contractor of sloppy or unacceptable workmanship. This does not, in our opinion, translate to the type of supervision and control that puts a party "in charge" of the construction. *Diomar v. Landmark Associates* (1980), 81 Ill. App. 3d 1135, 401 N.E.2d 1287.

The contract goes on to provide that the owner "shall make no disbursements until its representatives shall have inspected the improvements to verify the partial or total completion of the improvements at the date of inspection; however, the Owner shall exercise reasonable diligence and dispatch in the inspection of the partial or total completion and shall not delay said inspection so as to put off or unreasonably delay the payment of the disbursements as certified by the General Contractor."

By its terms, this provision links payment of the contractor's draw requests to the owner's inspections, and appears designed to assure Dayton that Prairie would not hold up payment simply because its agents were slow in verifying that the work was completed. As Reichert testified, he visited the site twice a month to ensure that the work Prairie was being billed for was actually completed. We do not believe that this type of inspection constitutes a reservation of the right to control and supervise work for purposes of Structural Work Act liability. See *Gentile v. Kehe* (1987), 165 Ill. App. 3d 802, 520 N.E.2d 827, *appeal denied* (1988), 121 Ill. 2d 569, 526 N.E.2d 830 (owner's observations of work to see he is getting what he paid for did not put him in charge of work).

Nor do we find that Prairie's contractual right to approve certain change orders or terminate the contract under certain conditions puts Prairie "in charge" of the construction. While the right to stop work, especially for safety reasons, may well support liability under particular facts, they are not to be viewed in a vacuum. See *Kjellesvik v. Commonwealth Edison Co.* (1979), 73 Ill. App. 3d 773, 777, 392

N.E.2d 116 (owner was in charge of work where his engineers had the authority to stop work that was being performed *unsafely*); *Voss v. Kingdon & Naven, Inc.* (1975), 60 Ill. 2d 520, 527, 328 N.E.2d 297 (engineering firm hired by city in connection with constructing sewage plant was in charge of work where engineers had broad authority over the work including the right to remove workers and suspend the work).

In *Sasser v. Alfred Benesch & Co.* (1991), 216 Ill. App. 3d 445, the court reversed summary judgment entered in favor of a structural engineering firm because the record contained detailed descriptions of the construction section engineer's duties. These included the right to reject work; notify the contractor to stop work in progress; suggest that the contractor consider effective coordination of construction activities; recommend disbursal of payments to contractor; recommend approval of equipment and materials; initiate and negotiate necessary changes; direct the contractor to correct any observed deficiencies in traffic control through construction zones; and furnish *continuous* field inspection of the materials and jobsite. The engineering firm also provided safety devices and kept daily records of the work. Six to eight personnel from the firm were present at the site each workday.

In contrast to the facts of *Sasser*, here it is evident that Prairie had no intent, right, or obligation to oversee the construction, interfere with or advise the contractor on how to perform its work, see to safety precautions, or otherwise participate in the construction, except insofar as Prairie's financial rights and obligations were affected. Reichert testified in his deposition that Prairie had the right to approve change orders or extra work if such orders exceeded $1,000. He also testified that Prairie would be notified of a change order if it significantly affected the *pro formas* submitted at the project's start so as to cause a significant deviation from the original financial schedule. These statements reinforce Prairie's role as the party responsible for the financing, rather than the construction itself. Prairie's interest in the changes was not shown to stem from any concern other than those affecting cost.

On the question of stopping work, there is no evidence in this case that Prairie ever exercised the power to stop the construction work for safety reasons (or any reason). Its retention of the right to terminate the contract with Dayton for substantial breach was directly related to its concern with costs and scheduling factors. Any material default or delay could stymie Prairie's ability to sell off the units at a profit. Moreover, under the common law of contract, a party may always treat as terminated a contract that has been materially breached.

In any event, we do not find a factual link between this inchoate right and the right to control the construction or suspend work for safety reasons, as was the case in *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 373 N.E.2d 1348 (engineer had authority to suspend work, change the plans and remove careless workers from the jobsite). (See also *Zukauskas v. Bruning* (1989), 179 Ill. App. 3d 657, 662, 534 N.E.2d 680, 684 ("[R]ight to merely reject work was not the same as having the right to stop the work 'if it were being done in a dangerous manner' ").) In *Fruzyna v. Walter C. Carlson Associates Inc.* (1979), 78 Ill. App. 3d 1050, 1054, 398 N.E.2d 60, 63, the court noted that "[w]hether or not [a party] has charge is determined not only from [his contractual obligations] but also from the surrounding circumstances and *from the role he in fact assumed.*" (Emphasis added.)

The third factor in the previously cited *Simmons* formulation relates to the degree of participation in ongoing activities at the site. Like the ability to control the work, this factor goes to a party's actual and regular involvement in the construction. Burger claims this factor is satisfied solely by Prairie's "placing several representatives at the site on a monthly basis." We have previously discussed the reason why Prairie's representatives visited the site and conclude that this does not equate with evidence of Prairie's actual "participation" in ongoing construction. See *Puttman v. May Excavating Co.* (1987), 118 Ill. 2d 107, 514 N.E.2d 188 (owner of excavation company that rented out equipment and operators but was not responsible for digging of ditch was not in charge of the excavation of a basement; company owner's visits to the site and furnishing of safety cage after accident occurred did not constitute constant participation in the work or exercise of supervision).

Burger does not contend that the fourth factor is present, and indeed it is indisputable that Dayton, not Prairie, coordinated the subcontractors. Dayton hired Levy, the drywaller that employed Burger. Prairie had no say in the hiring decisions.

The fifth factor concerns responsibility for safety precautions. Burger maintains that in addition to Prairie's ability to inspect the premises, Prairie's purchase of the builder's risk comprehensive general liability insurance also supports Prairie's obligations to ensure the safety of the workers. We disagree. The purchase of general liability insurance is often a necessity of doing business, and Prairie asserts that it was required to purchase insurance in order to obtain financing for the project. We find it difficult to accept the premise that the mere purchase of insurance might give rise to liability under the Structural

Work Act. Acquiring insurance is prudent in any event and bears little relationship to being responsible for the safety of a work site. Likewise, the fact that Prairie assumed the risk of loss during the period of construction goes to the financial risks that the parties allocated pursuant to their contract.

The eighth factor, familiarity with construction practices, is so general as to be almost useless in the analysis. Of course, anyone working on a construction project might be said to have some familiarity with construction practices, and certainly architects, engineers, general contractors, and subcontractors should have some such familiarity because that is their business. The owner of land might have no familiarity with construction practices or he might have a great deal of experience with them. In this case, Prairie had been involved in the financing of a number of major developments and could be assumed to have familiarity with construction practices. Knowledge of construction practices alone, however, is insufficient for Structural Work Act liability if the particular owner has no involvement in the construction itself and only comes to the site periodically to ensure that the contractor's draws are justified.

The final 2 of the 10 factors concern the ownership of equipment used at the site and the ability to correct unsafe or improper work habits or deficient equipment. Burger does not assert that Prairie owned or provided the equipment that the contractors used. Nor does he assert that Prairie directed any workers in the use of the ladder or its placement. Burger does not allege facts to support any inference that Prairie knew or should have known of any defects in the ladder. As for the authority to correct unsafe conditions, we have already found that Prairie had no authority or responsibility to oversee safety concerns, even assuming there was an unsafe condition or improper work habit involved in this case.

We conclude that the trial court did not err in granting summary judgment on count I of Burger's complaint. While Burger may have an abstract argument as to the existence of 1 or 2 of the 10 factors, we do not believe that isolating particular factors necessarily helps to resolve specific cases. Not all of the factors are created equal, and the courts consistently have looked to the totality of the circumstances. The pending case demonstrates that Prairie maintained a distinct and well-defined role as provider of the money and had only an attenuated connection with the actual construction activities, particularly those related to job safety. If Prairie was not in charge of the work, in its role as owner and money lender, it was not responsible under the Act for Burger's injuries.

## II

Burger next argues that the trial court's decision was flawed because the court cited the "hold harmless" agreement in the construction contract and implied that Prairie could insulate itself from its own negligence under that provision. According to Burger, provisions that purport to absolve a person from his own liability are void under Illinois law.

 This argument may be summarily rejected because although the general principle that Burger cites is accurate, it has no application to the facts of this case. The trial court merely noted that a provision in the contract required the general contractor to indemnify or hold harmless the owner "for any liability arising out of the work of the *general contractor.*" Burger seemingly ignores the actual wording of the contractual provision, which states in relevant part:

> "To the extent not otherwise covered by insurance, the general contractor shall hold the Owner harmless from any and all damages and claims that may be caused by the negligence on the part of the general contractor, his agents or employees [or subcontractors]. Provided, however, *the aforesaid indemnification and hold harmless shall not include or cover any injury, death, damage or destruction relating to any negligent act or omission of the Owner* (or its officers, agents or employees) *or any other contractor (or its subcontractors) or architect who has contracted directly with the Owner.* \*\*\* The general contractor will take all precautions necessary to protect the public against injury \*\*\*." (Emphasis added.)

Nothing in the foregoing provision attempts to shift the liability of Prairie's own negligence to Dayton. Burger cites cases that are inapposite to the pending situation and concludes that "[t]here can be no doubt that if, in fact, the contracting parties intended to relieve PRAIRIE of tort liability premised upon its own negligence, such agreement would be void against the public policy of Illinois." While we agree such an agreement would be void, the pending contractual provision does not, by its own terms, attempt to absolve Prairie from liability for its own negligence.

## III

 Burger's final argument relates to Prairie's alleged duty as a landowner to protect him from harm, the basis of count II of the complaint. This theory is premised on the allegation that Prairie was negligent, as a landowner, in failing to provide Burger with a safe and suit-

able support or scaffold so as to protect him in the performance of the work. We believe that if a landowner is not in charge of the work under the Act, he cannot logically or legally be found in breach of a tort duty that arises out of the negligent failure to provide a support or scaffold. Nevertheless, we briefly consider Burger's argument, which relies on section 414 of the Restatement (Second) of Torts (1965):

> "§414. *Negligence in Exercising Control Retained by Employer.* One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts §414 (1965).

The central concept of this section, like that of the Structural Work Act, is "control." Unless Prairie, acting as employer of the independent contractor, maintained control over Dayton's or Levy's work, Prairie had no common law duty to Burger, the injured employee of the independent contractor. We have already held that Prairie was not in charge of the work as a matter of law. While there may be some difference between a party's being in "control" instead of "in charge," we believe that the concepts are similar enough that the analysis under the Structural Work Act applies equally to the control issue. Prairie's contract with Dayton carefully delineates the parties' roles and the evidence reinforces that Prairie's actual role was titleholder and financial entity. Under Restatement section 414, moreover, the bare allegation that Prairie failed to provide an adequate support or scaffold is insufficient; the duty to exercise control with reasonable care is not assumed merely from landowner status. Since there is nothing to indicate that Prairie was responsible for providing the support or scaffold, or that it knew or should have known that the ladder in question was defective, there is no ground for a charge of common law negligence. Accordingly, we affirm the trial court.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.