(No. 75451.—

# FRED COCKRUM, Appellee, v. KAJIMA INTERNA-TIONAL, INC., Appellant.

*Opinion filed December 22, 1994.—Rehearing denied January 30, 1995.*

HEIPLE, J., dissenting.

Heyl, Royster, Voelker & Allen, of Peoria (Karen L. Kendall, Robert V. Dewey, Jr., Stephen J. Heine and Bradley S. McMillan, of counsel), for appellant.

James W. Yoder and J. Stephen Yoder, of Bloomington, and Edward J. Kionka, of Carbondale, for appellee.

Robert Steere, of Springfield, for *amicus curiae* Illinois State Chamber of Commerce.

John J. Bullaro, Jr., Robert C. Moore and James R. Branit, of Bullaro, Carton & Stone, of Chicago, for *amici curiae* Illinois Construction Industry Committee and Builder's Association of Greater Chicago.

Asher, Gittler, Greenfield, Cohen & D'Alba, and Anesi, Ozmon & Rodin, Ltd., all of Chicago, and Law Offices of Patrick A. Salvi, of Waukegan (Joel A. D'Alba, Curt N. Rodin, Richard A. Kimnach and Patrick A. Salvi, of counsel), for *amici curiae* Illinois State Federation of Labor & Congress of Industrial Organizations *et al.*

JUSTICE HARRISON delivered the opinion of the court:

In this appeal we are asked to decide whether the Structural Work Act (Ill. Rev. Stat. 1987, ch. 48, par. 60 *et seq.*) applies to plaintiff's claims against defendant. Plaintiff, Fred Cockrum, sought recovery against defendant, Kajima International, Inc. (Kajima), in the circuit court of McLean County for injuries he received while working for Atlas Window Cleaning Company (Atlas) at the Diamond Star Motors automobile plant construction site on November 14, 1987. Kajima had entered into a building construction agreement with Mitsubishi International Corporation (Mitsubishi), naming Kajima the design builder and placing Kajima in charge of the construction of the auto plant.

A glass and glazing company, Swanson Gentleman (Swanson), was one of 35 to 40 prime contractors on the Diamond Star project. Swanson had a contract with Kajima to install aluminum windows, glass, and aluminum doors at the Diamond Star construction site. Part of the contract required Swanson to have the windows cleaned after they were installed. Swanson subcontracted with ABC Window Cleaning to clean all the glass but, because ABC was unable to perform the work in a timely manner, Swanson canceled its contract with ABC and hired Atlas. Swanson's contract with Atlas was dated October 26, 1987. This contract required Atlas to use its own manpower and equipment to do the window washing job for Swanson.

Cockrum was sent to the Diamond Star construction site by Mr. Bernstein, the owner of Atlas. Cockrum had worked cleaning glass at the site three or four times during the three to four weeks prior to the accident, sometimes for several hours, sometimes for a longer period. On Saturday, November 14, 1987, Cockrum arrived at the plant at approximately 8 or 9 a.m. and, as required, stopped at the guardhouse and signed in. Cockrum and another Atlas employee, Butch Jackson, were working that day using aluminum extension ladders to clean the 15- to 18-foot exterior windows of the plant. Although Cockrum had previously asked Bernstein to provide a lift, suspended scaffold, or boom to work on, Bernstein had not done so and Cockrum thus performed his work using his own personal 24-foot extension ladder.

By 2 p.m. on the day of the accident, Cockrum had washed approximately 15 to 16 window panes. The work went slowly because there was glue, caulking debris, plaster and dirt on the glass. This debris had to be scratched off with a razor blade and then the windows were washed. Due to the length of the windows, Cockrum had to wash them in two sections, requiring him to descend and then reascend his ladder. When Cockrum was on the ground, his ladder was freestanding and had fallen down on two or three prior occasions that day because of the very windy weather.

At the time of the accident, Cockrum was standing on the ladder and reaching to scrape debris off a window. All at once he felt the wind and the movement of the ladder sliding to his left. Cockrum bent his knees and sprang forward. The ladder fell to the ground and Cockrum landed on his left hip, sustaining injuries. Butch Jackson and a security guard who had witnessed the accident came to Cockrum's assistance. The guard called for a "company nurse" who was working that day and, after examining Cockrum, she called for an ambulance.

According to the building construction agreement between Mitsubishi and Kajima, Kajima was responsible for "initiating, maintaining and providing supervision of safety precautions and programs in connection with the Work." Additionally, the agreement required that Kajima "shall supervise and direct the Work, using [its] best skill and attention. [Kajima] shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under this Contract." Kajima's safety and jobsite manual for the Diamond Star construction project stated at section 6.2.4: "Portable ladders shall be tied, blocked, or otherwise secured to prevent the ladder from being unintentionally displaced."

Evidence submitted at trial established that the ladder which Cockrum was using at the time of the accident was not long enough to reach the top of the building. As a result, the ladder could not be tied off because there was nothing in the area where Cockrum was working to which the ladder could be secured. Evidence at trial also established that Cockrum and other Atlas employees had been using extension ladders to clean windows on the upper level of the auto plant prior to the day of the accident, and that at least three-fourths of the total job of cleaning the windows had been completed by that day.

Following a jury trial, Kajima's motion for a directed verdict was denied, and a verdict was returned in favor of Cockrum and against Kajima in the amount of $500,000. The jury answered affirmatively the special interrogatory asking whether Kajima had violated the Structural Work Act. The trial court entered judgment on the verdict and denied Kajima's post-trial motion requesting judgment notwithstanding the verdict or, alternatively, a new trial. The appellate court, with one

justice dissenting, affirmed the judgment for Cockrum and against Kajima (243 Ill. App. 3d 402). We granted Kajima's petition for leave to appeal (145 Ill. 2d R. 315).

Section 9 of the Structural Work Act (the Act) provides:

> "Any owner, contractor, sub-contractor, foreman or other person having charge of the erection, construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure within the provisions of this act, shall comply with all the terms thereof ***.
>
> * * *
>
> For any injury to person or property, occasioned by any wilful violations of this Act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured ***." (Ill. Rev. Stat. 1987, ch. 48, par. 69.)

To sustain a cause of action for violation of the Act, a plaintiff must establish the following elements: (1) he was involved in structural activity; (2) the activity was being performed with reference to a structure; (3) a scaffold or other mechanical device was being used; (4) a defect existed in the construction or use of the device; (5) the defect proximately caused his injuries; (6) the defendant had charge of the work; and (7) the defendant willfully violated the Act's safety standard. See *Kohutko v. Four Columns, Ltd.* (1986), 148 Ill. App. 3d 181, 186; *St. John v. City of Naperville* (1982), 108 Ill. App. 3d 519, 522-23.

In this court, Kajima contends that its liability under the Act was not established because the evidence at trial did not prove the final two elements, that Kajima "had charge of" the work and that Kajima "willfully violated" the Act. However, as this court has repeatedly held, such determinations should not be overturned by entry of a judgment *n.o.v.*, nor should a verdict be directed for the defendant unless all of the evidence, when viewed most favorably to the plaintiff, so overwhelmingly favors the defendant that no con-

trary verdict based on that evidence could ever stand. (*McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93, 101-02, citing *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510; see also *Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 486.) Application of the *Pedrick* test to the case *sub judice* supports the appellate court's finding that the trial court properly denied Kajima's motions for a directed verdict and judgment *n.o.v.*

Kajima argues that it did not "have charge of" the work being performed by Cockrum because: (1) Kajima did not know that its subcontractor, Swanson, had employed Cockrum's company, Atlas, to perform work at the Diamond Star construction site, although prior written approval was required; (2) Kajima was not informed that any workers would be present on the non-scheduled workday, Saturday, on which the accident occurred, although notice was required to insure safety personnel could be on hand; (3) Kajima did not know Cockrum or any other Atlas employees would be working on the nonscheduled workday; (4) Cockrum was injured while using his own equipment; and (5) Atlas determined what equipment and method would be used to perform the work.

Whether a defendant is a person "having charge of" the work under the Act is primarily a factual inquiry which involves numerous factors, including those enunciated in *Chance v. City of Collinsville* (1983), 112 Ill. App. 3d 6, 11. (*Simmons v. Union Electric Co.* (1984), 104 Ill. 2d 444, 452.) As set forth in *Chance*, those factors are: (1) supervision and control of the work; (2) retention of the right to supervise and control the work; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) responsibility for taking safety precautions at the jobsite; (6) authority to issue change

orders; (7) the right to stop the work; (8) ownership of the equipment used on the jobsite; (9) defendant's familiarity with construction customs and practices; and (10) defendant's ability to assure worker safety or alleviate equipment deficiencies or improper work habits. *Chance*, 112 Ill. App. 3d at 11.

In the instant case, the contract between Kajima and Swanson, its glass and glazing subcontractor, provided: "When and if so ordered, Contractor shall stop or correct any part of the Work which [Kajima] deems unsafe or otherwise improper." Terrence Reid, Kajima's manager during the construction of the Diamond Star plant, testified at trial that Kajima had the authority to stop the work if any subcontractor was performing in an unsafe manner or was using equipment or a method that was unsafe. Although the right to stop the work, without more, is not conclusive in resolving the question of whether a person has charge of the work within the meaning of the Act (*McGovern v. Standish* (1976), 65 Ill. 2d 54, 68), our examination of the record herein reveals that, with the exception of Kajima's ownership of the equipment used on the jobsite, evidence at trial was adduced establishing each of the remaining factors enumerated in *Chance*.

Further, we find to be meritless Kajima's claims that it was not in control of the work because it was not informed Atlas was cleaning the windows, or that Atlas employees would be working on Saturday. Kajima's building construction agreement with Mitsubishi required Kajima to take reasonable precautions for the safety of "all employees on the Work," not just the employees of those subcontractors approved in writing by Kajima. Thus, the identity of Cockrum's employer holds no significance.

The building construction agreement also provided:

"[Kajima] shall perform construction management sercices [*sic*] for the Project for other contractors of the

Owner. These services shall include job site security, ***
first aid, [and] safety ***.

* * *

[Kajima] agrees to make available the construction
management sercices [*sic*] *** to other contractors of the
Owner continuously after such date and until the date of
the substantial completion of all Work ***."

Evidence at trial was that the only access to the
Diamond Star construction site was through a guard-
house, where each worker had to "sign in," informing
security of his employer and the name of his employer's
subcontractor. Cockrum testified that on the day of the
accident, he signed in with security, writing that he
worked for Atlas Window Cleaning. Cockrum gave fur-
ther undisputed testimony that he saw various other
workers at the jobsite on the day of his accident,
including landscapers, drywallers and electricians, and
that a Kajima nurse assisted him immediately after the
accident. Therefore, where it is clear that Kajima con-
trolled security and established the rules for access to
the jobsite, we believe the jury could reasonably infer
from the presence of other workers and Kajima's secu-
rity and first-aid personnel that Kajima had constructive
or actual knowledge of Cockrum's presence on the job-
site on the Saturday of his accident.

Additionally, the fact that Kajima did not have its
normal contingent of safety personnel present on the
day of the accident is not determinative, where Kajima
had the *right* to control the work that day. It may be
shown that a defendant was "in charge of" the particu-
lar operations which involve the violation from which
an injury arose either by proof that the defendant
exercised control, or that the right to control the work
existed, whether exercised or not. (*Emberton v. State
Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d
111, 119.) Therefore, based upon an assessment of the
totality of the circumstances herein, we find that the ev-

idence was more than sufficient to establish that Kajima was in charge of the work within the meaning of the Act. See *McGovern*, 65 Ill. 2d at 68.

Kajima also contends that any violation of the Act was not willful. In *Simmons*, this court noted that a willful violation of the Act occurs when one having charge of the work knows that a dangerous condition exists on a support device or, by the exercise of reasonable care, could have discovered the existence of such a condition. (*Simmons*, 104 Ill. 2d at 453.) Kajima argues that Cockrum's use of an improper method to clean windows for Atlas, a subcontractor that Kajima was unaware of, on a nonscheduled workday, was not reasonably discernable. However, we have already determined that sufficient evidence was presented for the jury to conclude that Kajima knew or should have known that workers, including Atlas' employees, might be present at the jobsite on the day of the accident. Therefore, it is only necessary to examine whether the jury, based upon the evidence presented at trial, could properly have concluded that Kajima knew or, by the exercise of reasonable care, could have discovered that the dangerous condition existed.

It is uncontested that the extension ladder Cockrum was using at the time of his accident was unsafe, unsuitable and improper for the window cleaning job because it was too short to reach the top of the building and thus could not be tied off. Kajima's manager, Reid, testified that if he, or any Kajima employee, had known the manner in which Cockrum was using the ladder, the work would have been stopped immediately. However, Cockrum testified that he had used the same ladder without securing it on three or four occasions on weekdays during the month prior to his accident. Cockrum stated that he had seen other Atlas employees cleaning windows in this same fashion. Indeed, Atlas

had started cleaning the windows on the north end of the Diamond Star plant, and had completed approximately three-fourths of the total window cleaning job by the date of the accident.

Additional evidence showed that the site where the windows were being cleaned could be seen from Kajima's office building, which was located approximately 500 to 800 feet southwest of the auto plant. Reid testified that if one came out the back door of Kajima's building and looked in that direction, one could see the area where Cockrum was working on the date of the accident. Reid further testified that Kajima's safety staff varied from four to eight or nine people, including the nurses. These Kajima personnel were responsible for monitoring the jobsite to insure conformance with safety standards, and performed weekly safety patrols, touring the entire project to identify safety problems and observe particularly hazardous areas of work. Reid stated that in addition to the safety staff, *all* 75 to 80 Kajima employees had "safety responsibilities."

Given this evidence of Kajima's pervasive presence at the jobsite and the open and ongoing nature of the work involved, we believe the jury could have concluded that Kajima knew, or could reasonably have discovered, the dangerous condition existing on the support device employed to clean windows at the plant. (See *McInerney*, 62 Ill. 2d at 103 (it was possible in structural work case for jury to infer that defendant general contractor knew or could have known of unsafe placement of ladder used by plaintiff due to the presence of defendant's superintendent on jobsite).) Although the *McInerney* decision is unclear as to whether the defendant's superintendent was present at the time of the plaintiff's accident, it is well-established that a defendant may "willfully" violate the Act without having an employee on the jobsite at the time of the accident, if the evidence

shows that ordinary care in the defendant's regular inspections would have discovered the defect. (See *Katz v. Shaf Home Builders, Inc.* (1981), 94 Ill. App. 3d 526, 529; see also *Brazier v. Kontos* (1987), 160 Ill. App. 3d 177, 183; *Moore v. Clearing Industrial District, Inc.* (1978), 64 Ill. App. 3d 391, 396-97.) Under this test, we believe that here the jury could properly find a willful violation of the Act, despite the absence of Kajima's safety personnel on the day of the accident.

Accordingly, the circuit and appellate courts correctly rejected Kajima's requests for a directed verdict and judgment notwithstanding the verdict where, under the *Pedrick* standard, it could be determined that Cockrum's injuries resulted from a violation of the Act by Kajima. In closing, we note that Kajima and the two groups who have been granted leave to file *amicus* briefs in its support cite Justice Steigmann's dissent below in urging this court to reverse the lower courts' judgments. However, Justice Steigmann clearly stated that he disagreed "not so much with the particular decision in this case as with the Act itself and the judicial gloss that has been given to it." (243 Ill. App. 3d at 420 (Steigmann, P.J., dissenting).) Indeed, these parties' main contention appears to be that imposing liability on Kajima under the Act will have serious public policy ramifications, including a "chilling impact on the business climate in Illinois." We decline to accept the invitation to examine whether these policy considerations might justify a change in our interpretation of the Act. This court has repeatedly held that the Act is to be given "a liberal construction to effectuate its purpose of protecting persons engaged in extra-hazardous occupations of working in and about construction, repairing, alteration or removal of buildings, bridges, viaducts, and other structures." (*McNellis v. Combustion Engineering, Inc.* (1974), 58 Ill. 2d 146, 151; see also *Harvel v. City of Johnston City* (1992), 146 Ill. 2d 277, 289; *Simmons*, 104

Ill. 2d at 459.) Therefore, we will continue to interpret the Act in light of its underlying purpose, until such time as the legislature may choose to alter this purpose by repeal or amendment of the Act.

For the reasons given, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE HEIPLE, dissenting:

I dissent for the simple reason that the defendant did not willfully violate the Structural Work Act. To hold otherwise is to make a contractor the absolute insurer of all of his subcontractors and their employees, quite regardless of the contractor's fault. Unfortunately, that is where this decision and its predecessors place us.