In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3013

ROBERT NOBLE and ANDRENE NOBLE,

Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 94 C 1165--John F. Grady, Judge.

Argued September 6, 2000--Decided November 1,
2000

Before CUDAHY, COFFEY and RIPPLE, Circuit
Judges.

COFFEY, Circuit Judge.  In the Fall of
1991, the United States hired Paris
Contracting Company to do extensive work
at the Postal Service's Chicago,
Illinois, main vehicle maintenance
facility. While the work at the post
office facility was in progress, Robert
Noble, an employee of Paris was injured
when he fell off an unsafe scaffold he
was using to perform repair work on the
concrete ceiling./1 Based on the
injuries he sustained, Noble filed suit
in the Northern District of Illinois
claiming that the United States was
liable under the Federal Tort Claims Act
(FTCA) and the Illinois Structural Work
Act for his injuries./2 The district
court, after conducting a four-day bench
trail on the issue of liability,
concluded that the United States was not
liable for Noble's injuries because the
Postal Service was neither "in charge" of
the overall project nor of the specific
work Noble was performing at the time he
was injured. The experienced trial judge
also found that even if the Postal
Service was in charge of the construction

site, it did not wilfully violate the Illinois Structural Work Act and, therefore, could not be held liable under Illinois law. We affirm.

I.  BACKGROUND

As stated heretofore, the United States Postal Service hired Paris to renovate the main vehicle maintenance facility in Chicago; the contract was to be completed within six months at a cost of approximately $500,000. As is the case with most contracts (and particularly those involving the United States), the written document in this case details many of the rights and responsibilities of the respective parties to the contract.

A.  The Contract

The contract between Paris and the United States specifically requires the contractor, Paris, to comply with all applicable Occupational Safety and Health Standards as well as any other Federal, State, or local regulations governing workplace safety. In that regard, and before Paris was awarded the contract, the construction company was required to submit a safety program for Postal Service approval. However, according to Paul Steiner's (the Postal Service's contracting officer) testimony, the Postal Service, because of its limited personnel and budget, relied upon the contractor to: 1) ensure the safety of the postal employees within the construction area; 2) ensure the safety of the contractor's employees; and 3) protect the work and property of others.

Thomas Syrigas, a Paris employee who was designated as the contractor's job superintendent with respect to safety, testified that his responsibilities included that he "supervise the job, make sure everyone was on the job site, see if everything was done right, [and] talk to the men about safety." In addition to being "the first one on the site and the last one to leave," Syrigas was responsible for conducting weekly safety meetings and to ensure that the site was "a safe place for people to work in."

With regard to the Postal Service, the procurement manual (part of the contract)

made clear that "the objective of any purchase action is performance of the contract objectives, not control of the contractor's businesses." According to the manual, Postal Service personnel were to devote their efforts to "quality assurance, cost monitoring, and other activities intended to ensure compliance with contract terms." Furthermore, the manual explicitly prohibited Postal Service personnel, except in cases where the contract specifically required it, from "direct[ing] the contractor's management activities or interven[ing] to supervise, train, or discipline contractor personnel." According to Steiner, it was neither the duty, obligation, nor the practice of the Postal Service to run the contractor's business or to tell the contracting company how to do its work. Rather, the Postal Service allowed the contractor to carry-on his or her business as the contractor saw fit as long as the Postal Service received the quality of work it had contracted for in a timely fashion.

According to Steiner, his representative, Ray Leon Tritt, was responsible for the oversight of the "day-to-day" operations at the construction site. However, Tritt had "very limited contracting authority" and could not make any changes in the terms of the contract. Furthermore, Tritt testified that he had no authority to order or direct any of Paris's employees to perform their work in a particular manner. Rather, according to Steiner's testimony, Tritt's responsibilities included going to the site, meeting with the architectural engineering firm and the contractor, checking on the progress, and evaluating and preparing the progress payment paperwork. Tritt was also responsible for ensuring that the contractor was paying his employees the proper wages, verifying that the contractor had a certain percentage of minorities working on the project, and reviewing and approving the contractor's safety plan. However, Tritt did have the authority to issue a correction letter,/3 through Steiner, if the contractor failed to correct any deficiency previously noted by Tritt. According to Tritt, if he discovered obvious, emergency safety hazards on the project he was to point them out to the contractor, but that the only safety

concern he ever raised to the contractor concerned postal employees' complaints about dust and the failure to erect dust partitions. All this being said, Tritt was acting as the Postal Service's representative for approximately 15-20 other projects during this same time frame, and visited the Paris construction site on an average of only two times a month.

Under the terms of the contract, the Postal Service retained the right to terminate the work, in whole or in part, if it was determined to be in the Postal Service's best interest. The Postal Service also retained the right to cancel the contract if the contractor was requiring its workers to perform tasks in unsafe conditions. In total, Steiner could stop the work if the contractor was not doing sufficient work, if the work was not done in a timely manner, if the work was done poorly, or if there was a violation of safety standards.

B.  The Injury

As part of the contract between Paris and the Postal Service, Paris had Noble perform the overhead patchwork. In order to work on the ceiling, Noble was required to stand on a scaffold, and, with the permission of Syrigas and Paris, Noble worked without supervision during the day.

On the date of the accident, Noble was working on a scaffold that: 1) was without guardrails; and 2) which was missing one of the three "pics" (the wooden or metal planks at the base of the platform used as the walking and standing area of the scaffold). Furthermore, the two remaining "pics" on the scaffold floor were uneven. Noble testified that he tripped over one of the uneven pics, and fell off the scaffolding because he was unable to regain his balance due to the missing plank and the fact that the scaffold was without the required guardrails./4

Based on the injuries Noble sustained from his fall off the scaffold, Noble brought suit against the United States under the Federal Tort Claims Act and the Illinois Structural Work Act. After a four-day bench trial, the trial judge concluded, as a matter of law, that the United States was not liable for

Noble's injuries because the Postal Service was not "in charge of" the worksite. After reviewing the testimony, the judge also concluded that because the Postal Service had no legal duty to assign more than one inspector to the project much less any legal duty to inspect the project more frequently than it did, the Postal Service had not committed a "wilful violation" of the Illinois Structural Work Act in failing to discover the contractor's use of the damaged and unsafe scaffold. Finally, the judge determined that the Postal Service did not "proximately cause" Noble's injuries. Noble appeals.

II.  ISSUES

On appeal, Noble argues that: 1) the district court erroneously concluded that the Postal Service was not "in charge of" the worksite; and 2) the judge's conclusion that the Postal Service did not commit a "wilful violation" was therefore also erroneous.

A.  Standard of Review

Initially, the parties disagree as to the appropriate standard of review to be applied. The plaintiffs-appellants, relying on the concurrence in United States v. Frederick, 182 F.3d 496, 504 (7th Cir. 1999), argue that the proper standard of review is de novo because they are not disputing the facts, as determined by the district court, but are merely making arguments as to the application of the law to those facts. However, Noble ignores the clearly established circuit law mandating that this court apply the clearly erroneous standard of review. In Savic v. United States, 918 F.2d 696, 700 (7th Cir. 1990), this court clearly stated that:

Findings of fact pursuant to FTCA and the Illinois Structural Work Act must be affirmed unless they are clearly erroneous. Phillips v. United States, 792 F.2d 639, 644 (7th Cir. 1986). A finding is clearly erroneous when, although there may be some evidence to support it, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511, 84 L. Ed.2d 518 (1985) (quoting

United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 746 (1948)). "We may have such a conviction if the trial judge's interpretation of the facts is implausible, illogical, internally inconsistent or contradicted by documentary or other extrinsic evidence." E.E.O.C. v. Sears Roebuck & Co., 839 F.2d 302, 309 (7th Cir. 1988) (citations omitted).

See also Damnjanovic v. United States, 9 F.3d 1270, 1273 (7th Cir. 1993) (The determination as to whether a party is in charge of the work is a factual question.) (citing Isabelli v. Cowles Chem. Co., 289 N.E.2d 12, 18 (Ill. App. Ct. 1972)). Furthermore, even the majority in Frederick, the case relied upon by the appellants, applied the clearly erroneous standard. Frederick, 182 F.3d at 499. We thus decline the plaintiffs-appellants' invitation to change the standard of review to be applied in this type of case and continue to apply the clearly erroneous standard of review./5

B.  The Illinois Structural Work Act

This case arises under the Federal Tort Claims Act, 28 U.S.C. sec.sec. 2671-2680, and therefore this court must apply "the law of the place where the act or omission occurred," 28 U.S.C. sec. 1346. Because Noble was injured in Illinois, we apply the relevant Illinois statute, the Structural Work Act. In order to prevail under the Structural Work Act, Noble must prove that:

(1) plaintiff was engaged in or was passing under or by a structural activity; (2) the activity was being performed with reference to a structure; (3) a scaffold or other mechanical device was being used; (4) a defect existed in the construction or use of the device; (5) the defect proximately caused the plaintiff's injuries; (6) the defendants had charge of the work being performed; and (7) the defendants willfully violated the Act's safety standards.

Thompson v. MCA Distrib., Music Corp. of America, 629 N.E.2d 206, 208 (Ill. App. Ct. 1994). For the purposes of this appeal, the appellants challenge the trial court's determination under prongs

six and seven of the above described test; that is, his finding that the United States was not in charge of the worksite (prong six) and that the United States did not willfully violate the Illinois Structural Work Act (prong seven).

## C.  In Charge of the Worksite

The question of whether the United States Postal Service or the general contractor was in charge of the worksite is considered under the totality of the circumstances test. Savic, 918 F.2d at 700 (citing Gentile v. Kehe, 520 N.E.2d 827, 829 (Ill. App. Ct. 1987)). According to the Illinois Supreme Court, ten factors are to be weighed when determining whether a particular defendant is "in charge of" a project under the Structural Work Act:

(1) supervision and control of the work; (2) retention of the right to supervise and control the work; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) responsibility for taking safety precautions at the jobsite; (6) authority to issue change orders; (7) the right to stop the work; (8) ownership of the equipment used on the jobsite; (9) defendant's familiarity with construction customs and practices; and (10) defendant's ability to assure worker safety or alleviate equipment deficiencies or improper work habits.

Cockrum v. Kajima Int'l, Inc., 645 N.E.2d 917, 920 (Ill. 1995) (citing Chance v. City of Collinsville, 445 N.E.2d 39, 42 (Ill. 1983)). Additionally, the Illinois Supreme Court has held that the term "having charge of" in the Structural Work Act "is one of common usage and understanding." Larson v. Commonwealth Edison Co., 211 N.E.2d 247, 252 (Ill. 1965). In this case, the trial judge thoroughly analyzed each of the ten factors with respect to the question of whether the United States was in charge of the worksite.

With respect to the first factor, who was responsible for the supervision and control of the work, it is important to note that the contract did not require Tritt to make a particular number of

visits to the jobsite, and, as the trial judge concluded, Tritt only made an average of two visits per month to the worksite. The district court also concluded that Steiner's one visit during the entire duration of the contract, even when combined with Tritt's two-visit-a-month average, was insufficient to establish that the Postal Service had the required supervision or control of the jobsite. According to the judge,

[n]o one else with any contractual responsibilities visited the worksite, and it seems to me that it would be distorting the meaning of the word "control" to say that the postal service had control of the work in this case or that it supervised the work in this case.

According to the procurement manual, Tritt's and Steiner's visits to the worksite were to ensure "contract objectives, not control of the contractor's business." And, as we stated in Savic, "the government should not be held liable for merely requiring compliance with the contract and insuring the quality of the work." 918 F.2d at 700 (emphasis added) (internal quotations and citations omitted). Thus, the facts set forth in this record weigh against a finding that the Postal Service exercised control over the worksite.

With regard to the second factor, the retention of the right to supervise or control the work, the district court judge concluded that it was unclear from the contract whether the Postal Service did, in fact, retain such a right, and left it as an open question. On the one hand, the United States clearly had the authority to issue a change order which could affect the method and manner in which the work was performed. However, the testimony of Tritt and Steiner established that the Postal Service's main concern was that the government received what it contracted for in a timely fashion and, furthermore, that the government was not in the business of controlling the day-to-day operations of the contractor. However, paragraph G.21(a) of the contract between Paris and the Postal Service states that:

a. The contract officer may at any time, without notice to any sureties, by written order designated or indicated to

be a change order, make changes in the work within the general scope of the contract, including changes--

  1.  In the specifications (including drawings and designs);
  2.  In the method or manner of performance of the work;

  3.  In the Postal Service-furnished facilities, equipment, materials, services, or site; or

  4.  Directing acceleration in the performance of the work.

Paragraph G.21 gives the Postal Service rather extensive authority to alter the project by issuing a change order in a variety of circumstances. Given that the second factor only requires the retention of the right to supervise or control, we are of the opinion that factor number two weighs in favor of the United States being deemed in control of the site because "[r]etention of this right [control] is . . . significant, even if it is not exercised." Savic, 918 F.2d at 701.

  The third factor, whether the United States constantly participated in the ongoing activities at the construction site, clearly, as the trial judge concluded, did not occur in this case because Tritt only visited the site twice a month and was the Postal Service's representative for approximately 15-20 other projects in progress at the same time, and furthermore, Steiner only visited the job site on one occasion during the entire period of the contract. We hasten to point out that none of the parties dispute this finding. It is also clear that the fourth factor, whether the Postal Service had supervision and coordination of the subcontractors, weighs against finding that the Postal Service was in control of the worksite. Because no privity of contract existed between the government and the subcontractors which would allow the Postal Service to exert any authority over the subcontractors (none of the parties assert that the United States had any control over subcontractors), the judge correctly concluded that the fourth factor weighed against a finding that the government had control of the jobsite.

According to the Illinois Supreme Court, the fifth factor to be considered is the responsibility for taking safety precautions at the jobsite. Like factor number two, the district court judge did not specifically conclude whether or not this factor weighed in favor or against finding that the government exercised control of the worksite. However, thecontract did specifically state that the contractor must comply with all OSHA, federal, state, and local safety regulations. Furthermore, we note that Paris was required to designate an employee (Syrigas) to be responsible for the safety concerns on the project. Although the Postal Service approved the contractor's final safety plan as presented, Steiner testified that it was the contractor's responsibility to ensure that the safety plan was followed. Additionally, as noted in Savic, 918 F.2d at 701, the fact the Postal Service was not involved in the day-to-day operations establishes that it was not responsible for safety precautions. Given the language of the contract, the understanding of the parties, and the fact that Tritt was at the project site only, on average, twice a month, and Steiner was there but once, we are of the opinion that factor number five (responsibility for safety precautions) weighs against finding that the government had control of the worksite.

Factors six and seven, the authority to issue change orders and the right to stop work, when considered in isolation, weigh in favor of finding that the United States had control of the worksite because, as the interested parties agree, the Postal Service had the authority to do both. But, factor number eight, ownership of the equipment used on the project, weighs against finding the government had control because, as the trial judge determined, all of the equip ment used at the construction site, including the defective scaffold involved in Noble's accident, were the property of and under the control of the contractor, Paris.

The trial judge concluded that factor nine, the defendant's familiarity with the construction, customs, and practice, when viewed in insularity, weighed in favor of a finding that the United States was in control of the jobsite because the

government representatives were very familiar with the construction business in general and with government construction contracts in particular. According to Tritt's testimony, he was the government's representative for over 15 similar construction sites and had "been involved in the construction industry for all of his adult life." Further, Steiner served as the government's contracting officer for approximately 200 Postal Service contracts per year in Illinois, Indiana, and Michigan. Given these facts, we agree with the trial judge that the government's representatives were familiar with the custom and practice of the construction business. Savic, 918 F.2d at 701.

Finally, factor ten, whether the United States was in a position to assure worker safety or alleviate equipment deficiencies, or improper work habits, clearly weighs against finding that the Postal Service had control of the worksite. As the district court observed, Tritt was at the worksite only twice a month and Steiner visited the construction site only once during the duration of the contract. In Savic, 918 F.2d at 701, this court stated that:

it is at best highly questionable and nigh unto impossible for the government to be in a position to assure worker safety or alleviate equipment deficiencies or improper work habits (the tenth element), given that the government inspectors visited the construction site only once or twice during an ordinary work day.

If the government was not in a position to satisfy the tenth factor when it visited the construction site only once or twice a day as we observed in Savic, obviously factor ten weighs against finding the United States was in control of the worksite when Tritt, the Postal Service representative, only visited the site twice a month, and Steiner visited the site only on one occasion during the entire period of the contract.

In Damnjanovic, 9 F.3d at 1276, this court cautioned against merely totaling up the ten factors and seeing which party had more factors in its favor. Rather, courts must engage in a totality of the

circumstances approach in each case and, as we stated in Damnjanovic, whether a party has charge of the worksite "depends upon the surrounding circumstances and the role the party assumed on the worksite." 9 F. 3d at 1275 (citing Burger v. Prairie Dev., Ltd., 578 N.E.2d 1113, 1119 (Ill. App. Ct. 1991)).

We are in agreement with the trial judge and conclude that, under the totality of the circumstances test, the government should not be considered in charge of the construction site in this case for the following reasons. Initially, while we do not just add up the factors to determine which parties have control of the worksite, we can certainly use the factors as part of our analysis, Savic, 918 F.2d at 704, and only four (factors two, six, seven, and nine) of the ten factors weigh in favor of the finding that the United States was in control of the worksite. Additionally, we have stated that of the ten factors "particular emphasis is placed on those related to job safety," and all the factors even arguably related to job safety (factors three, five, eight, and ten) weigh against finding that the Postal Service was in control of the worksite. Also, both Steiner and Tritt testified that, while they had the authority to stop work at the construction site, the very limited purpose of that aspect of their authority and the contract was to ensure that the Postal Service got what it paid for within the time frame of the contractual document. With regard to the Postal Service, the procurement manual made clear that "the objective of any purchase action is performance of the contract objectives, not control of the contractor's businesses." According to the manual, Postal Service personnel were to devote their efforts only to "quality assurance, cost monitoring, and other activities intended to ensure compliance with contract terms." (Emphasis added). Furthermore, the manual explicitly prohibited Postal Service personnel, except in cases where the contract specifically required it, from "direct[ing] the contractor's management activities or interven[ing] to supervise, train, or discipline contractor personnel." (Emphasis added). According to Steiner, it was not for the Postal Service to run the contractor's business

or tell it how to do its work. Rather, according to the procurement manual and Steiner's testimony, the Postal Service allowed Paris to conduct business at the construction site as it saw fit so long as Paris performed the work in a timely manner and the government received the work it had contracted for. And, as this court and Illinois courts have said, "the government should not be held liable for merely requiring compliance with the contract and insuring the quality of the work." Savic, 918 F.2d at 700 (internal quotations and citations omitted); see also Gentile, 520 N.E.2d at 830.

Based on the totality of the circumstances, we agree with the decision of the trial court that the United States was not in charge of the worksite./6 Consequently, the decision of the district court is

AFFIRMED.

/1 According to Noble's complaint and appellate brief, he fell 10-15 feet to the ground and sustained "severe and permanent injuries, both internally and externally." The appellants' counsel advised this court at oral argument that Noble is receiving Worker's Compensation for his injuries.

/2 Although the Structural Work Act, 740 Ill. Comp. Stat. 150/1-150/9 (West 1992), was repealed by the Illinois legislature in 1995, it was in effect at the time of Noble's accident, and we therefore apply it in this case. Atkins v. Deere & Co., 685 N.E.2d 342, 348 (Ill. 1997).

/3 As the name implies, a correction letter is a letter issued by the Postal Service (through Steiner in this case) that informs the contractor of what corrections at the job site need to be made. According to Steiner's testimony, he would typically issue correction letters if work was being performed in an unsafe manner.

/4 It is important to note that the contractor supplied and maintained all of the equipment used at the site, including the unsafe scaffold involved in Noble's accident.

/5
It is important to note that, at oral argument, the appellants conceded that this case was "moot" if the clearly erroneous standard was applied. Despite the appellants' concession, we believe

that further discussion is warranted.

/6 As we noted in Savic, the fact that the government is not in control of the construction site in this case is sufficient to affirm the trial judge's decision. Savic, 918 F.3d at 704, 706 n.12. Given that the appellants conceded at oral argument that this case was "moot" if the clearly erroneous standard was to be applied, and our conclusion that the judge correctly determined that the United States was not in control of the worksite, we do not address the alternative findings of the district court that the Postal Service did not willfully violate the Illinois Structural Work Act and that the Postal Service did not "proximately cause" Noble's injuries.